THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARBARA BOYLE, Defendant-Appellant.

Fifth District No. 5—85—0366

Opinion filed September 30, 1987.

F. Lee Bailey and Daniel Patrick Leonard, both of Law Offices of Bailey & Fishman, of Boston, Massachusetts, and Frederick M. Steiger, of Clayton, Karfeld & Steiger, of St. Louis, Missouri, for appellant.

Dick Allen, State's Attorney, of Edwardsville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, and Susan M. Young, of Syracuse, New York, of counsel), for the People.

JUSTICE LEWIS* delivered the opinion of the court:
The defendant, Barbara Jean Boyle, was charged by indictment with three counts of murder in the deaths of her husband, Ronald Gusewelle, and his parents, Arthur and Vernita Gusewelle. A jury found her guilty of the murder of her husband and not guilty of the murders of his parents. The trial court denied her post-trial motion for a new trial and sentenced her to a term of 50 years in the Illinois Department of Corrections. She appeals, presenting 14 issues for our review: (1) whether the trial court erred in denying her motion to dismiss "In View Of The Pattern Of Highly Improper Conduct By The Prosecution"; (2) whether the trial court erred in denying her motion to dismiss "Despite Extensive And Prejudicial Pre-Indictment Delay"; (3) whether the trial court erred in denying defendant's motion for relief from pretrial publicity "Where Pretrial Polling And Jury Voir Dire Indicated That The Community Had

---

*Justice Lewis replaced Justice Jones, who retired after the cause was taken under advisement.

Been Significantly And Negatively Affected By Pervasive Pretrial And Trial Publicity"; (4) whether the trial court erred in excluding from evidence the favorable results of a polygraph examination administered to the defendant, "As It Was Conclusively Proved That Such Examinations Are Reliable And Do Not Impinge On The Function Of the Jury; And Whether Such Exclusion Violated The Defendant's Right To Due Process Under The Illinois And United States Constitutions"; (5) whether the defendant's due process rights under the United States and Illinois constitutions were violated "By the State's Failure To Abide By An Agreement Not To Prosecute Based On Her Submission To A Successful Polygraph Examination"; (6) whether the defendant's due process rights were violated because the testimony of the prosecution's chief witness was "Secured By Means Of An Impermissible 'Contingent' Agreement And The Trial Court Erred In Denying A Motion To Exclude Said Testimony"; (7) whether the trial court erred in admitting hearsay statements "Because Those Statements Did Not Meet The Requirements For Admissibility Under The Co-Conspirator's Declaration Exception To The Hearsay Rule And The Admission Of These Statements Violated Defendant's Right Under The Confrontation Clause"; (8) whether the trial court erred in allowing "ATF Agent McGarvey To Testify As To Statements Allegedly Made By Co-Defendant Handy Where Said Statements Were Not Provided To The Defense Prior To Trial Although Specifically Requested"; (9) whether the trial court erred in allowing "ATF Agent McGarvey To Testify As To His Agency's Opinion Or Conclusion Regarding Defendant's Guilt And Said Testimony Deprived Boyle Of A Fair Trial"; (10) whether statements made by Lori Elam, since deceased, were improperly excluded as hearsay "Where Those Statements Fell Under The Statements Against Penal Interest Exception To The Hearsay Rule and Said Exclusion Violated Defendant's Right To A Fair Trial"; (11) whether the trial court's failure to give a jury instruction "Requested By The Defendant Violated The Defendant's Constitutional Right To Due Process And Deprived Her Of A Fair Trial"; (12) whether the defendant's right to due process was violated because the jury returned a verdict based on insufficient evidence; (13) whether the trial court improperly denied the defendant's motions for mistrial and new trial on the grounds of prosecutorial misconduct; (14) whether the sentence of 50 years is unduly harsh.

To facilitate understanding of some of the issues the defendant raises concerning pretrial matters, a thumbnail sketch of the facts of the case is appropriate at this juncture, although a fuller statement

of the evidence adduced at trial appears below. We note that the record on appeal in this case consists of more than 5,000 pages. At trial the State put on evidence to show that the defendant, in conjunction with Glennon Engleman, planned the murder of her husband, Ronald Gusewelle, in order to obtain the proceeds of numerous insurance policies on his life, many, if not most, of which she herself purchased through the mail. The defendant and Ronald Gusewelle were married on May 28, 1976. Upon his death on March 31, 1979, at the age of about 33, 14 insurance policies on his life were in effect, the proceeds of which amounted to approximately $194,000. Nine of the policies named the defendant as the beneficiary; five of the policies were for credit life insurance. The State sought to show that after having planned the murder of Ronald Gusewelle, but prior to its occurrence, the defendant learned of the relative wealth of his parents, and, together with Engleman, planned their murders in order to augment Ronald's estate. Arthur and Vernita Gusewelle were murdered on November 3, 1977. The net estate of Arthur Gusewelle, who briefly outlived his wife, amounted to $522,000 after taxes and costs and was divided equally between Ronald and his brother, Richard Gusewelle. The net value of Ronald Gusewelle's estate was approximately $597,000. The defendant appears to have inherited his entire estate pursuant to the terms of his will, which is in evidence. The principal witness for the State was Robert Handy, who testified pursuant to a plea agreement concerning his part in the murders of the three Gusewelles. According to his testimony, they had each been shot by Glennon Engleman. The State sought to show that Engleman, who did not testify, had received compensation from the defendant for his part in the slayings. One of the witnesses called by the defendant was Andre Jones, who, while awaiting sentencing upon three convictions of murder unrelated to the three Gusewelle murders, had confessed to having killed Ronald Gusewelle. Jones later recanted his confession, indicating that he had obtained information about the murder of Ronald Gusewelle in part from Robert Miller, a deputy sheriff with the St. Clair County sheriff's department. A videotape of Jones' retraction was played to both the grand and petit juries, and a transcript of the videotape recording is in evidence. In it, Jones stated that Detective Miller, to whom he had made the confession, had threatened him and had furnished him not only with police and autopsy reports concerning the death of Ronald Gusewelle that had enabled him to confess to the slaying but also with money and "Valiums." Jones indicated further in the video-taped retraction that he had obtained at

least some of the same information from his attorney at the time, Robert Gagen. Robert Miller testified at trial but not before the grand jury. He denied having given any such information to Andre Jones and denied having threatened or induced him to confess. Robert Gagen testified at trial that he had received such police reports through discovery prior to meeting with his client in anticipation of a hearing with respect to the imposition of the death penalty.

On August 9, 1984, the defendant was charged by indictment, subsequently amended, with committing the murders of Arthur, Vernita, and Ronald Gusewelle. On October 30, 1984, the defendant filed a motion for relief from the effects of pretrial publicity, asking the court, *inter alia*, to distribute a detailed questionnaire to prospective veniremen in Madison County "in order to ascertain the extent of bias which exists with regard to the instant case." The defendant asked the court to fashion a remedy to counter any bias it might determine to exist, including dismissal of the indictment or change of venue. On December 7, 1984, the defendant filed an "Omnibus Motion to Dismiss Indictment," stating as grounds that her rights to a fair trial and an impartial jury under the fifth, sixth, and fourteenth amendments to the Constitution of the United States and under the laws of the State of Illinois had been abrogated by the misconduct of the State's Attorney and that the State's Attorney had abused the grand jury process by failing to present "clearly exculpatory evidence to the grand jury which returned the Indictment," by having had improper contact with the grand jury foreman and two other members of the grand jury, by having presented extraneous material to the grand jury, by having used the grand jury "as a discovery device to prepare for the pending trial," and by having breached "the veil of secrecy in releasing to the public and press matters which were before the grand jury." The defendant stated further in the motion that the State's Attorney and his agents had improperly commented to the press and public concerning the case "in order to inflame and prejudice prospective jurors" and that "certain evidentiary matters of a highly prejudicial nature were purposely 'leaked' to the press prior to the completion of the grand jury proceedings in conjunction with the effort to prejudice the case." In further support of the motion the defendant said:

> "The State's Attorney combined with the United States Attorney for the Southern District of Illinois to deprive the Defendant of her right to extradition proceedings in the State of Florida where she was arrested. The United States Attorney, at the apparent bidding of the State's Attorney, utilized a

federal grand jury to return an indictment against the Defendant so that she could be removed from Florida without the necessity of extradition. Upon the Defendant's return to the District of Southern Illinois, the federal indictment was dismissed and she was released to the Madison County authorities."

The defendant stated also that the "extraordinary delay between the occurrence of the offenses alleged in the Indictment and the return of said Indictment was unreasonable and unnecessary and has severely prejudiced the Defendant's defense and constitutes a denial of her right to due process."

On February 21, 1985, the trial court conducted an extensive hearing on the defendant's omnibus motion to dismiss and her motion for relief from the effects of pretrial publicity. The defendant called several witnesses to testify, including Donald Weber, the State's Attorney at the time in question whose conduct was addressed by the defendant's omnibus motion. A market research manager testified for the defendant concerning the results of a survey of 402 registered voters of Madison County. The survey was conducted for the defendant to determine opinions about and awareness of this case among registered voters in Madison County. Another of the defendant's witnesses was Robert Miller, who testified that he had not provided Andre Jones with information concerning the death of Ronald Gusewelle or in any way coerced the confession from him. Testifying for the State at the hearing was Dennis Kuba, a special agent with the Illinois Division of Criminal Investigation, who stated that he and Deputy Donald Spaul had interviewed Robert Miller on September 5, 1984. According to Special Agent Kuba, Robert Miller had told them that he had had two interviews with Andre Jones, during the first of which "Andre Jones verbally admitted to the murder of a white subject at Coleman's Plaza in East St. Louis." Robert Miller had asked Detective Stone of the East St. Louis police department if he was familiar with such a murder. Detective Stone advised Detective Miller that "a white person by the name of Ronald Gusewelle had been murdered by—in Coleman's Plaza and his body had been discovered there." Detective Miller recalled, according to Special Agent Kuba, having read newspaper articles about the murder of Ronald Gusewelle following his conversation with Detective Stone so that "when he went back to reinterview Andre Jones he was somewhat familiar with that investigation." Detective Miller had stated in the interview with Special Agent Kuba and Deputy Spaul that he might have "inadvertently

surrendered some information to Andre Jones during the interview."

In an order entered March 4, 1985, the trial court stated with regard to the defendant's motion for relief from pretrial publicity that the courts in Illinois have indicated a preference for delaying the decision as to a change of venue until jury *voir dire*. The court stated further that the defendant had not demonstrated sufficient cause for departing from the traditional practice of using jury *voir dire* as the best test for determining whether a defendant could obtain a fair trial in that county and therefore denied her request for a change of venue at that time, adding that the request might be renewed if it became appropriate following *voir dire* of the jury. In the order of March 4, 1985, the court, after careful consideration evident in the order, denied the defendant's omnibus motion.

In her brief the defendant contends that the prosecution abused the grand jury process by failing to present to the grand jury exculpatory evidence, namely, Detective Miller's statements that he did not provide Andre Jones with information concerning the death of Ronald Gusewelle or in any way coerce a confession from him. The defendant asserts in her brief that "Detective Miller's testimony would have significantly affected the grand jury's evaluation of the retraction." Addressing the omission of testimony by Detective Miller before the grand jury, the trial court stated in its order denying the defendant's omnibus motion that the matter

> "must be viewed in the context of the totality of the evidence that was before the Grand Jury. When all of that evidence is considered, and when it is remembered that the Grand Jury was making only a probable cause determination, this Court cannot find that the defendant suffered actual and substantial prejudice by the failure of the prosecutor to present the evidence in question."

As the supreme court stated in *People v. Creque* (1978), 72 Ill. 2d 515, 527, 382 N.E.2d 793, 798, *cert. denied* (1979), 441 U.S. 912, 60 L. Ed. 2d 384, 99 S. Ct. 2010, "A defendant may not challenge an indictment on the ground that it is not supported by adequate evidence. (*People v. Jones* (1960), 19 Ill. 2d 37.) Guilt or innocence is to be determined at trial." Traditionally, an indictment has not been quashed because of a lack of proper grand jury evidence unless all evidence before that body has been subject to suppression. (*People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396.) There is no suggestion of that here. However, even if a defendant could challenge an indictment on the ground of inadequacy of evidence, the instant record would not support such a chal-

lenge. Although we have a part of the transcript of proceedings before the grand jury when that body heard evidence concerning the Gusewelle murders, we do not appear to have the report in its entirety, as the trial court seems to have had. Hence, we have no basis for disagreeing with the trial court's conclusions as set forth above. We do, however, have the transcript of the entire proceedings before the petit jury, before whom Robert Miller testified essentially as he had testified at the hearing on the defendant's omnibus motion to dismiss. Nevertheless, the petit jury found the defendant guilty of the murder of Ronald Gusewelle beyond a reasonable doubt, a far more exacting standard of proof, needless to say, than that of probable cause. There is nothing in this record to suggest that, had the grand jury heard the testimony of Robert Miller as it was given at the hearing on the defendant's omnibus motion to dismiss and at trial, the evidence upon which to make a determination of probable cause would have been insufficient. Since Detective Miller's testimony plainly did not affect significantly in the defendant's favor the petit jury's evaluation of Andre Jones' retraction, we think—assuming that an indictment might be so challenged—that her point concerning the potential impact upon the grand jury is not well taken.

■ With respect to the defendant's contention concerning the prosecutor's contact at lunch on apparently two occasions with the grand jury foreman and other members of the grand jury, the trial court stated in its order as follows:

> "The defendant has also complained that the prosecutor had improper contact with the Grand Jury foreman and other members of the Grand Jury. This allegation has been proved by the evidence, but the defendant has again failed to show how she suffered actual and substantial prejudice. Absent that showing, the defendant is not entitled to a dismissal. The Court allowed inquiry into this area by examination of Mr. Weber during the hearing on the Motion to Dismiss, and Judge Romani had previously held an *in camera* inquiry of the Grand Jury concerning this matter. The Court has considered the evidence at that hearing and received the Grand Jury transcript, and is satisfied that the defendant was not prejudiced."

As we have indicated, the record on appeal includes part of the proceedings before the Madison County grand jury, including that of September 6, 1984, when Judge Romani examined the grand jury concerning these allegations. His examination of the grand jurors makes clear beyond question that the defendant suffered no preju-

dice as a result of any unauthorized contact between the prosecutor and the grand jurors.

■ The defendant maintains that "the trial court erred in denying [her] motion to dismiss the indictment on the ground that [she] has not demonstrated sufficient prejudice, because the State's Attorney's conduct vitiated the indictment *per se*, and thus, no prejudice need be shown." A trial court has inherent power to dismiss a charge when due process so requires (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244), but this should rarely be done (*People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396). In Illinois, to support a dismissal of a charge, prosecutorial misconduct must result in actual and substantial prejudice to a defendant. (*People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396.) Nevertheless, the defendant invites us to adopt a rule of *per se* invalidation—which we decline to do—principally on the basis of *United States v. Mechanik* (1984), 735 F.2d 136, the holding of which the Supreme Court ultimately rejected in *United States v. Mechanik* (1986), 475 U.S. 66, 89 L. Ed. 2d 50, 106 S. Ct. 938. In *Mechanik* two witnesses testified simultaneously before the grand jury in violation of Federal Rule of Criminal Procedure 6(d). The court of appeals rejected the argument that defendants must show that a Rule 6(d) violation prejudiced them before an indictment may be dismissed. A divided court of appeals sitting *en banc* agreed. (*United States v. Mechanik* (1985), 756 F.2d 994.) In *Mechanik* the defendants had not learned about the joint testimony until the trial had begun. The trial court took the motion to dismiss the indictment under advisement until the conclusion of the trial, the petit jury returned a verdict of guilty beyond a reasonable doubt, and the trial court subsequently denied the defendant's motion for dismissal of the indictment. The Supreme Court held that "however diligent the defendants may have been in seeking to discover the basis for the claimed violation of Rule 6(d), the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation." (475 U.S. 66, 73, 89 L. Ed. 2d 50, 58, 106 S. Ct. 938, 943.) The court reasoned that "the petit jury's subsequent guilty verdict not only means that there was probable cause to believe that the defendants were guilty as charged, but that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." (475 U.S. 66, 70, 89 L. Ed. 2d 50, 56, 106 S. Ct. 938, 942.) In the instant case, the petit jury's verdict aside, Judge

Romani's *in camera* examination of the grand jurors displayed that error on the part of the prosecutor was, like that in *Mechanik*, harmless, having caused no prejudice to the defendant.

■ The defendant contends similarly that the prosecutor's presentation of "Improper and Inflammatory Material to the Grand Jury" requires dismissal of the indictment in the absence of resultant prejudice to the defendant. The material to which she refers is the presentation to grand jurors of 96 slides, one of which was a slide of the elder Gusewelles' residence. Of this presentation the trial court stated in its order:

> "The defendant complains that former State's Attorney Weber presented improper material to the Grand Jury, and the evidence sustains this allegation. It is undisputed that former State's Attorney Weber presented a certain photographic slide show to the Grand Jury, which was the same slide show he presented in other settings to potential voters in his reelection compaign [*sic*]. At the request of counsel, the Court has now viewed the slide presentation, although without the benefit of the explanatory remarks from the former prosecutor which accompanied the presentation to the Grand Jury. Most of the slides depict various crime scenes from disposed [*sic*] cases on which the Grand Jury would not be hearing evidence. The only slide pertaining to the Gusewelle case was an exterior view of a residence. There were also several slides which memorialized high praise for the former prosecutor, and some which depicted him receiving some sort of 'awards.'
>
> While the slide presentation might have had some educational value for the Grand Jury, if handled properly, it was mainly an attempt of the former State's Attorney to aggrandize himself in the eyes of the Grand Jury. As such, it was highly improper. There is, however, no evidence that the Grand Jury was thereby pressured or influenced to return an indictment against the defendant, and a due process violation has not been established."

Former State's Attorney Weber testified as follows about the slide in question and his comments about it: "The slide was a slide of Art and Vernita Gusewelle's house, and it precedes the home—a picture of the Kubeys (ph) down in Granite City, and I just say after we go though a number of murders that we have solved, I said there are still some murders that aren't solved, and we hope some of these new scientific methods will help us be able to solve them." Defendant argues, "As with the other grounds raised above, it is the

Defendant's contention that the action of the State's Attorney requires a *per se* dismissal of the indictment without reference to any actual prejudice suffered by the Defendant. Therefore, the trial court improperly denied the Defendant's motion to dismiss." We disagree and, as we have already stated, decline to adopt the *per se* rule defendant proposes. The defendant having suffered no prejudice as a result of the prosecutor's misconduct, the trial court did not err in denying her motion to dismiss on that basis.

The defendant asserts that her motion to dismiss the indictment ought to have been granted because of collusion between former State's Attorney Weber and Federal authorities in order to deprive her of her right to an extradition hearing in Florida. As the State points out, the only person to testify concerning this matter was former State's Attorney Weber, who indicated that the Federal indictment had been obtained somewhat hastily in order to avoid a potential problem arising out of the running of a statute of limitations. Contrary to the defendant's claim of collusion, the witness testified that the Federal indictment had not been obtained for the purpose of avoiding extradition proceedings. Thus, the trial court observed correctly in its order that "[t]he evidence simply does not sustain this claim."

Although the defendant makes other contentions with respect to the first issue she raises for review concerning "The Pattern Of Highly Improper Conduct By The Prosecution," it is not necessary to address them in detail. We have considered each of them and find no basis in either the record or the law for disturbing the trial court's ruling in this regard denying her omnibus motion to dismiss the indictment.

■ We turn to the second issue defendant raises, whether the trial court erred in denying her omnibus motion to dismiss the indictment despite extensive and prejudicial preindictment delay. In *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244, which considered the question of whether preindictment delay in three cases, consolidated on appeal, was so prejudicial as to be a denial of due process, the supreme court set forth the requirement that, where there has been a delay between an alleged crime and indictment or arrest or accusation, the defendant must come forward with a "clear showing of actual *and* substantial prejudice" (emphasis in original) (67 Ill. 2d 449, 459, 367 N.E.2d 1244, 1248). If the accused satisfies the trial court that he or she has been substantially prejudiced by the delay, the court said, the burden shifts to the State to show the reasonableness, if not the necessity, of the delay. "If this

two-step process ascertains both substantial prejudice and reasonableness of a delay, then the court must make a determination based upon a balancing of the interests of the defendant and the public. Factors the court should consider, among others, are the length of the delay and the seriousness of the crime." (67 Ill. 2d 449, 459, 367 N.E.2d 1244, 1248.) In the trial court's order of March 4, 1985, it stated:

> "Under *People v. Lawson* 67 Ill. 2d 443 [*sic*], which authorizes a dismissal on due process grounds as the result of pre-indictment [*sic*] delay, the defendant must come forward with a clear showing of actual and substantial prejudice. This the defendant has failed to do. Even assuming prejudice, the State has met its burden of showing the reasonableness and necessity of the delay. It is clear that until certain evidence became available to the State in the spring or early summer of 1984, this case was not prosecutable. Applying the test mandated by *Lawson* of balancing the interests of the defendant and the public, and considering such factors as the length of the delay and the fact that defendant is charged with three murders, the Court finds that the defendant is not entitled to a dismissal based on a denial of due process because of pre-indictment [*sic*] delay."

The defendant disputes the trial court's finding that she was not prejudiced by the delay and, stating that the trial court did not reach the issue of whether the delay was reasonable, maintains that the prosecution did not and could not meet its burden under *Lawson* of showing that the delay was either reasonable or necessary. She argues that "by failing to conduct the balancing test mandated by *Lawson*, the trial court improperly denied the Defendant's motion to dismiss." She contends that she demonstrated actual and substantial prejudice inasmuch as "the testimony of an extremely important witness, Lori Elam, was lost to the defense due to Elam's death and the unique Illinois rule regarding the admissibility of statements against penal interest. If the prosecution had not been delayed, Elam's exculpatory evidence would have been available to the defendant." However, at the hearing on her omnibus motion to dismiss the indictment, the defendant appears to have put on no evidence and made no offer of proof concerning Lori Elam. At no time does the defendant indicate when Elam died. Furthermore, former State's Attorney Weber testified concerning facts relevant to the delay. Andre Jones, who had confessed to the killing of Ronald Gusewelle in September of 1979, maintained as late as May of 1984 that

he was responsible for Ronald Gusewelle's death. Later, in May of 1984, Jones recanted the confession. The State's Attorney's office first received reports in February or March of 1984 from the Federal Bureau of Alcohol, Tobacco and Firearms concerning "various crimes *** committed by a person and others, by the name of Engleman." The witness stated that he had been informed that Robert Handy had been approached by Federal authorities about testifying against Glennon Engleman but that Handy had "refused to deal." In June or July of 1984, the witness said, he had, with police officers, approached Handy, who agreed to give a statement concerning the Gusewelle murders and to testify. The witness stated that, "[u]ntil Handy agreed to testify, we didn't have sufficient evidence to base an indictment, I don't think." The record in the instant case supports the trial court's conclusions and refutes· the defendant's contentions. Ruling in accord with the requirements of *People v. Lawson*, the trial court did not err in denying the defendant's motion to dismiss the indictment on the basis of preindictment delay.

With respect to the third issue the defendant presents for review, concerning the trial court's denial of her motion for relief from pretrial publicity, she maintains that pretrial polling and jury *voir dire* indicated that the community had been significantly and negatively affected by pervasive pretrial and trial publicity. She argues that, "notwithstanding the self-serving assertions of the prospective jurors, [the defendant was] patently unable to obtain a fair trial in Madison County and that the trial court erred in denying Boyle's motion for change of venue, request to be permitted to send confidential questionnaires to prospective jurors, and motion for new trial." As the trial began, following *voir dire*, the defendant renewed her motion for change of venue. In denying the motion the trial court made the following observations:

> "The Court in the Jury selection process was generous in the exercise of excusals for cause, and the Court at no time denied the defense a challenge to a juror for cause. The Court notes further that the defense did not exhaust all peremptories. We went through 59 jurors to get the regular panel of 12. Of those included on the Jury, there do not appear to be any who have been exposed to any prejudicial or inflammatory matter. Most had only, if any knowledge at all, only a general knowledge of what the Defendant was charged with and the names of the victims. Counsel for both sides were given the opportunity to explore fully any knowledge the ju-

rors might have had about this case and any opinions they might have reached.

The Court is satisfied that these jurors will give the the [*sic*] Defendant a fair trial."

The report of the proceedings of *voir dire* is included in the record on appeal. We have read the entire transcript. The comments of the trial court are a fair and accurate assessment of the *voir dire* conducted in this case, which was extensive, careful, and thorough.

■■ ■ The general rule in Illinois is that a defendant is entitled to a change in venue when it appears that there are reasonable grounds to believe that prejudice against the defendant actually exists and that by reason of this prejudice there is a reasonable apprehension that defendant cannot receive a fair and impartial trial. (*People v. Knippenberg* (1979), 70 Ill. App. 3d 496, 388 N.E.2d 806.) The decision whether to grant a change in venue is discretionary with the trial court, and, absent an abuse of that discretion, the decision will not be reversed. (*People v. Knippenberg* (1979), 70 Ill. App. 3d 496, 388 N.E.2d 806.) There is nothing in the instant record to suggest that the jurors selected were anything less than fair and impartial. In *Knippenberg*, as in the case at bar, a poll had been conducted to determine the attitudes of voters in the county in question. There we said:

"That defendant can point to potentially harmful publicity within a community as indicated by the survey does not, standing alone, establish proof of community prejudice to warrant a change in the place of trial.

\* \* \*

The most valuable tool in determining local attitudes towards a defendant is found in the examination of prospective jurors in the voir dire." (70 Ill. App. 3d 496, 499, 388 N.E.2d 806, 809.)

That examination gave no cause for apprehension that the defendant could not receive a fair and impartial trial in Madison County, and the trial court did not abuse its discretion in denying the defendant's motion for a change of venue following *voir dire* or err in denying her earlier motion for relief from pretrial publicity.

■■ Defendant's fourth assignment of error is the trial court's exclusion from evidence of the favorable results of a polygraph examination of the defendant. In Illinois polygraph evidence is inadmissible. (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.) We are without power to overrule the Supreme Court of Illinois and, therefore, do not address the issue further.

 With respect to the fifth issue she raises for review, the defendant maintains, in reliance upon *People v. Starks* (1985), 106 Ill. 2d 441, 478 N.E.2d 350, that her right to due process was violated by the State's failure to abide by an agreement not to prosecute based upon her submission to a successful polygraph examination. In *Starks*, which was decided shortly after the trial in the instant case was concluded, the supreme court held enforceable an agreement between the State and a defendant requiring the State to dismiss its case against the defendant if the defendant took and passed a polygraph examination. The defendant in *Starks* contended that a Lake County assistant State's Attorney had agreed to dismiss the charge of armed robbery against him if he submitted to and passed a polygraph examination conducted by a Libertyville police lieutenant, Danny McCormick. The polygraph examination was given by the police officer named, who found the defendant truthful in his denial of any knowledge of or involvement in the armed robbery. The cause in *Starks* was remanded for an evidentiary hearing to determine whether, in fact, such an agreement existed.

In the instant case the trial court permitted the defendant, following trial, to file and argue a supplemental motion to dismiss the indictment based upon an agreement similar to that in *Starks* that she alleged existed between her and the State. The parties stipulated that the report of Detective Robert Hertz, attached to the motion, represented the relevant events that had transpired. According to the report, on April 16, 1979, the defendant, accompanied by her attorney at the time, Gerald McGivern, was interviewed by Detective Hertz in the office of Assistant Madison County State's Attorney Robert Trone, who was present. The officer's report of the same date states in pertinent part:

> "She [defendant] was then asked if she would submit to a polygraph examination in order to check her truthfulness on this statement and McGivern immediately replied 'no.' This officer then tried to tell her that this examination could rule her out completely as a suspect in this investigation and at that time McGivern told this officer, 'she is not taking a polygraph, don't ask the question again.' This officer did not inquire any further on this point, at this time."

On April 23, 1979, Gerald McGivern sent to Robert Trone a copy of a report of a polygraph examination of the defendant prepared by Dwight Whitlock, a licensed polygraph examiner. In his accompanying letter her attorney asked that Robert Trone file the report and not release to anyone the fact that the defendant had taken the test

without first discussing the matter with him. In denying the defendant's motion to dismiss the indictment on the basis of this alleged agreement, the trial court observed:

"[The defendant] refused to accept the State's offer. She later made a counter offer, and the Court can not imagine that had she flunked that test that she would have voluntarily disclosed that fact to the State. As the Court sees it, she had nothing to lose in taking the polygraph test without the State's knowledge. There was no mutuality of obligation, and I don't think the facts of this case present the type of public policy agreement for enforcing an agreement made by the State to which the Starks or Stark case addresses itself."

Defendant's assertions to the contrary, no mutuality of agreement existed between the State and the defendant. The defendant's attorney had responded unequivocally that the defendant would not take a polygraph examination and was not to be asked to do so again. Shortly thereafter, entirely without the knowledge of the State, the defendant took a polygraph examination conducted by a private examiner of her choice. The State had no opportunity in advance of the test given to defendant to address matters relevant to the reliability of that particular test. The results, favorable to the defendant, were forwarded to the State. There was no obligation on the part of the defendant to make known to the State at any time the results of the test had they been unfavorable to her. Thus, unlike the defendant in *Starks*, the defendant here did not surrender her fifth amendment privilege against self-incrimination. Under the circumstances presented, we do not think that an agreement of the kind held enforceable and binding on the State in *Starks* existed in the instant case. Accordingly, the trial court did not err in denying the defendant's motion to dismiss the indictment on that basis.

Before we address the other issues the defendant raises, we set forth further relevant evidence adduced at trial, which began on April 1, 1985, and ended on April 14, 1985. The evidence showed that sometime after 6 p.m. and before 6:50 p.m. on November 3, 1977, Arthur Gusewelle was shot twice in the back of the head and Vernita Gusewelle was shot three times in the back of the head in their farm home in Hamel. There was no evidence of a forced entry. Vernita's body was found by medical personnel face down on the kitchen floor. Clogged by blood, her watch had stopped at 6:50 p.m. Arthur Gusewelle expired at 9:27 that evening after having called the operator for help and stating he had been "robbed." When medical personnel arrived, he indicated he had been robbed by "a couple

of guys." The witness, who had attended him, indicated that Arthur's speech was "so slurred you couldn't hardly understand him." A Madison County deputy sheriff counted five .22-caliber ammunition casings in the area where Vernita's body was found. The house had been ransacked extensively, but police could never establish that anything was missing.

Ronald Gusewelle farmed part time and worked at the Amoco refinery in Wood River. On March 31, 1979, he worked the evening shift there and left the plant at about 10:50 p.m., turning apparently in the direction he usually turned in order to reach his home, also in Hamel. At 7 a.m. on April 1, 1979, the defendant called the local police inquiring about her husband who, she said, had not returned home from work. At about 7 p.m. on April 4, 1979, Ronald's body was found on the passenger side of the backseat of the automobile he had driven to work on March 31. The automobile, a gray, two-door, 1972 Camaro, was found parked near a cyclone fence on the west side of the parking lot of Coleman's Plaza, formerly the Holiday Inn, in East St. Louis, where it had been, according to witnesses, since about March 31. Over the upper part of the body was a brown garbage bag and two towels. A package of prophylactics was found in a pocket of the blue jeans as well as some change. The victim's wallet and wristwatch were missing. On April 5, 1979, Dr. Steven Nuernberger performed an autopsy upon the body, which was in a state of moderate decomposition. The autopsy revealed a gunshot wound to the chest about five inches from the base of the throat. The path of the bullet was from "front to back, or anterior to posterior and slightly downward." The bullet had lodged in the victim's esophagus. Further, there was "large blunt trauma" to the left side of the skull of the deceased from which the brain extruded. Above the defect in the scalp was an "X"-shaped laceration of the scalp. The victim's left leg had sustained a "green stick," or twisting, fracture 2½ to 3½ inches above the ankle. The pathologist was of the opinion that the gunshot wound to the chest had occurred first because there was no tissue reaction, that is, swelling, to the head or leg injuries, indicating a lack of sustained blood pressure at the time the head and leg injuries occurred. The pathologist described death as secondary to cardiac tamponade, which occurs when the fibrous sac surrounding the heart fills with blood. The path of the bullet indicated that the weapon had been fired at an angle or that the decedent was leaning over to some extent when the bullet struck him. The witness said that the victim could not have remained standing for more than 13 seconds after he was shot and

that he was dead or dying when the other injuries were inflicted. The head wound had been caused by being struck with a blunt object that had. "at least one curvilinear margin which is outlined by the posterior curvilinear defect in the skull." The pathologist stated, "[A]ny object that has a curved surface of that diameter or a 2½ inch diameter could do it. It might be any one of a thousand objects." The witness testified further, "The X-shaped laceration above the large defect is also—the X shape just reflects tissue crushing trauma. The X shape does not necessarily relate whatsoever to the shape of the object." He added, "Any flat surface may create an X-shaped laceration in the scalp, sir, if I pop you hard enough." There were abrasions on the victim's back that had occurred after death.

Robert Handy testified for the State that he had made an agreement on July 24, 1984, with the State of Illinois that if he "cooperate[s] with them and pleads guilty to conspiracy" to commit murder on three separate charges concerning the murders of Arthur, Vernita, and Ronald Gusewelle, he would receive the maximum sentence of 14 years for the offenses. The plea agreement is in evidence and states that the 14-year term of imprisonment is to run concurrently with his "present term of incarceration for Mail Fraud" and that "[t]he People agree that Handy be given credit for time served from February, 1980 to present time." The agreement provides further that "[t]he Defendant, Robert Handy, agrees to testify freely and truthfully in all proceedings against any and all ather [sic] persons who are charged in connection with the murder of Arthur, Vernita and Ronald Gusewelle" and that "[i]n the event that the Defendant, Handy, does not cooperate completely and fully or does not testify truthfully in any proceedings related to this investigation this agreement is void and the plea entered pursuant to this agreement is to be withdrawn by the consent of all parties hereto." The agreement is signed by Don Weber as State's Attorney, by Robert Handy, and by Marty Hadigan, Handy's attorney.

Handy testified that he had known Dr. Glennon Engleman, a dentist, for about 25 years and had met the defendant in 1970 or 1971, when she was recently divorced. He said that he and Engleman had gone to her home in Wood River and disassembled a child's bed. Handy had had occasion to be with the defendant at other times and had seen her go into Engleman's dental office on two occasions, one time prior to the death of the elder Gusewelles and another time after their deaths and prior to the death of Ronald Gusewelle. He testified further that on November 3, 1977, "just before sunset," he and Engleman had driven up "into the back of this farm

house." Engleman had gloves with him and carried Handy's attache case containing "a rope and a .22 target pistol." He described the weapon as an automatic "rifle pistol" with a long barrel. Handy remained in the car and kept the motor running. He saw two people at the back door, heard five to seven gunshots, which he was not counting, and saw Engleman emerge from the house five to seven minutes later. The two left, and Engleman emptied the rope and pistol out of the attache case.

Handy testified that on March 31, 1979, Engleman had come to Handy's house in the St. Louis area at about 8:30 p.m. Engleman had with him two "sets" of gloves, a plastic bag, and a .38 pistol with a two-inch barrel, bluesteel with a pearl handle. They went in Engleman's car to the parking lot of a shopping center that included a Venture store and waited about 10 to 15 minutes, when the defendant drove up and Engleman and Handy got into her car. Handy lay down on the backseat of her car, and Engleman got in the front seat and "got down, so it appeared that there was only one *** person in the automobile." They arrived at the defendant's residence at about 11 p.m. The three got out of the car after she had parked it in the garage in the stall to the right, as one looks at the garage from the outside. The defendant went into the house; Handy and Engleman remained in the garage in the dark with the doors closed. About 10 to 15 minutes later a car came into the driveway and approached the garage. The driver of the car got out and raised the garage door on the left side of the garage, whereupon Engleman shot him "in the chest, in the heart" with the .38 caliber pistol and then struck him in the head "three or four times, maybe five times" with a two- or three-pound, short-handled hammer, commonly referred to as a hand sledge. Handy thought the victim had stepped inside the garage just before or after being shot. When the victim fell on the floor, Handy testified, "Engleman yelled at Barbara [the defendant], told her to bring some towels, and Engleman started dragging the body back to the car that he drove in with, back to the, it was a Camaro." The defendant, he said, "came out of the house with the towels and was picking up the blood with the towels." He said that "some of Ron's blood" was on the floor at the far left side of the left garage door, the area the defendant was cleaning with the towels. While the victim was on the floor of the garage, Engleman asked Handy to help him put the body of the victim, a large man, in the backseat of the Camaro, which Handy described as white. Having dragged the body on its back, holding it under the armpits, Engleman was putting the body

into the passenger side of the car. Handy said, "So I went on the left side of the automobile and stepped inside the car, and I held him by the shoulders and the arms, and I pulled him in. Engleman lifted his legs up from the outside." "When we was leaving," Handy said, "Dr. Engleman told her [defendant] to wait, I remember what he said; he said to wait a couple of hours and then call where he worked, and I believe he worked at Standard Oil Company, and find out why—if he was working late, and when they tell him [*sic*] that he left a couple of hours earlier that then she was to call the hospitals and call the police department, make inquiries of him." Handy stated that Engleman "had a trash bag or leaf bag or something, and he draped this over him." Handy did not remember where Engleman had obtained the trash bag. Handy did not remember anything else having been placed over the body. Engleman drove the Camaro with Handy on the passenger side back to the parking lot where Engleman's car had been parked. Handy then drove Engleman's car as he followed Engleman, still driving the Camaro, to "a little motel of some sort" surrounded by a cyclone fence in "a business section" in "East St. Louis someplace," an area with which the witness was not familiar. Engleman parked the Camaro and got into the passenger's seat of his own car, giving Handy directions out of the area. Handy said that the plastic bag Engleman had brought with him was smaller than a trash bag and that Engleman told him that he had the gun and the hammer, as well as the victim's billfold and watch, in the plastic bag.

Handy testified further that in "[m]aybe March or May" of 1976 Engleman had told him "that Barbara was getting married, or had gotten married and that he was going to kill Barbara's husband for the insurance." The defendant was, he said, "to get as much insurance as possible" with herself as the beneficiary. Approximately four or five months later, in about September of 1976, Engleman had told Handy that "Barbara's husband's parents were wealthy farmers." Engleman told Handy "he knew this to be true because Barbara had told it to him." Engleman indicated that, as a result of this information, "they was going to wait and first kill Mr. and Mrs. Gusewelle for the inheritance" and, after "the inheritance got straightened out," they were "going to kill Ron Gusewelle." Engleman asked Handy to participate in the offense and told him "that his wife, Ruth Engleman, was going to assist him with it." Handy testified that as he and Engleman were driving to the elder Gusewelles' home on November 3, 1977, Engleman told him "that he was going, since they was active with the Farm Bureau, and he had

on a suit and tie, he said that he was going to state that he was from the Farm Bureau, and this would give him easy access to the entrance to their home." Having arrived at the elder Gusewelles', Handy said, "[h]e drove into their home, they had the lights on, you know, in the driveway. Engleman got out of the automobile. He grabbed my attache case and walked up to the door, and they let him in." Engleman had told him that "he was going to tell them to lay down, and he was going to tie them up." The rope was, however, "still in the package" when Engleman returned from the house:

> "Well, he said he walked in and told them he was from the Farm Bureau and to get into the house, and when he got in the house he opened up the attache case, pulled out the gun, told them both to lay face down on the floor that he was going to tie them up, which he said they did. And as soon as they laid down on the floor, he shot them."

Explaining further, Handy said, "So they laid down expecting to be tied up. So then when they laid down, then he shot them in the back of the head." Engleman had told him that "he pulled drawers and opened up doors and took the bed apart and opened up the ice box and went through the refrigerator. And to make it look like somebody had pilfered through the home." Handy described Engleman as a target shooter familiar with guns, who owned several guns and practiced in a shooting gallery located in the basement of Engleman's sister's house. Engleman told Handy that he had destroyed the weapon used to kill the elder Gusewelles by cutting it up and disposing of it. He described the weapon as being "twin" of a High Standard pistol shown to him earlier. Other evidence showed that the High Standard pistol in question would seem to a lay person to be similar in appearance to one of the two weapons identified by ballistic experts as capable of firing the casings found in the elder Gusewelle's home. Handy testified that Engleman had needed money in order to pay taxes owed for several years to the Internal Revenue Service. After the deaths of the elder Gusewelles, Engleman had told Handy that "Barbara had told him that she was having—or having trouble with the rebate [sic] because of her brother-in-law, because he is arguing against it or something or other. He was rebutting it, so that slowed down the probate." Handy described plans discarded by Engleman for the murder of Ronald Gusewelle, among them the following:

> "[H]e said what he would do, he was going to go in and tie up Barbara like it was a robbery and she was there, and then

when Ron come in, he was going to kill Ron like he resisted and throw some furniture around and break some lamps. And then leave Barbara tied up in the bed, and then when the children [the defendant's children by a prior marriage] or somebody come by, she would be found."

Engleman had said that the defendant "didn't like the idea." Engleman had said further that the reason for having the defendant pick them up at the parking lot was "[s]o that there would be nothing unusual at her home. Her car would be there, Engleman's car wouldn't be there, and it wouldn't alert or alarm anybody." Handy testified that when they arrived at the defendant's residence, she had said that "Ron was punctual, that he would be home right away and that to get ready, so she went into the house, and I believe she changed clothes, and Dr. Engleman and I remained in the garage." Handy said there was a "considerable amount of blood" and that Engleman "yelled at Barbara and told her to bring the towels, that—ready for the towels. So then she appeared, and she had a bundle of towels. They started laying the towels down, and Glen was dragging the body over to the car." After the victim's body had been left in the parking lot of the motel, Engleman told Handy that "he had put some prophylactics in his pocket" in order to "make it look like it was a sex killing or something or other, robbery and a sex thing." Engleman told him he had destroyed the gun used to kill Ronald Gusewelle. Handy said that he had been aware of the delay in finding Ronald Gusewelle's body: "Engleman would tell me that he would drive over there each morning just to see if they had found it, you know, until they did find it." Handy stated that Engleman "wasn't to contact Barb. Barb wasn't to contact him until the thing settled, and she had some money. Engleman was in debt with his taxes, and I believe it was three months or four months after Ron Gusewelle was killed that Engleman said that Barbara had helped him out with his income tax" in order to pay off an Internal Revenue Service lien. Handy testified that he did not know how often after the killing of Ronald Gusewelle Engleman and the defendant "contacted. He did say that she would get ahold of him, that he wasn't going to call her, and when she did call him that she went to Northland, north St. Louis, and she would use the pay phone to call him at the office [in the St. Louis area]." Likewise, Handy said, if Engleman attempted to call the defendant he would go over to Illinois and use a telephone there. Handy said that "[t]here has been a few times that Barbara Gusewelle has tried to get ahold of Dr. Engleman and was unable to. She would call me and say that she

was trying to locate Dr. Engleman." Handy said that he would give the message to Engleman. He did not recall the dates because "[i]t was insignificant to me at the time." The witness said that at the time he had resided in Mehlville, Missouri, a couple of blocks from Engleman's condominium. He testified that on September 26, 1984, by giving directions to sheriff's deputies Major Robert Hertz and Sergeant Donald Spaul he had retraced with them the route taken by him and Engleman to reach the residences of the elder Gusewelles and Ronald Gusewelle and the defendant.

On extensive and vigorous cross-examination, Handy stated that he had been told by former State's Attorney Weber that if he did not cooperate he would be charged with "capital murder." He said that Weber had wanted details directly implicating the people named. Handy maintained that he had received no compensation for his part in the three murders. He testified that he recalled the time of arrival at the elder Gusewelles as just before sunset, although he agreed that, because of the time of year, the sun had, in fact, probably already set when they arrived there. He stated that Engleman had told him the elder Gusewelles "had no company that night [November 3, 1977]. How he knew this, I don't know." Handy said that in the interview on July 24, 1984, he had described the defendant's automobile on the night of March 31, 1979, as a full-sized, white, two-door Oldsmobile. He did not recall that an electric door opener had been used to open the garage door to the right and said that he might have told Detective Spaul that "one member of the party" had opened the garage door manually so that the defendant could drive in the garage. He could not recall how the door to the right had been opened. Other evidence established that the door on the right was, in fact, electrically operated, although the one on the left was manually operated. Handy recalled that the headlights of the Camaro were on, that Engleman was about two feet from Ronald Gusewelle when he shot him, and that the victim pivoted slightly after being shot. Handy said that Engleman was right-handed and had struck the victim with the sledgehammer on the right side of his head. He indicated that Engleman had struck a blow to the victim's head while he was still on his feet and had struck him repeatedly after he had fallen. After the body had been put into the Camaro, Engleman "folded" the victim's feet under him.

On redirect examination Handy said that Engleman was standing right in front of him in the dark garage and that when the headlights from the Camaro shone into the garage they were somewhat blinding.

Outside the presence of the jury, Ruth Engleman, the former wife of Glennon Engleman, testified so that the trial court could determine whether certain statements made by Engleman to her were made in furtherance of the conspiracy to murder the Gusewelles. Pursuant to the trial court's ruling, in the presence of the jury she testified that she and Engleman were married on April 15, 1967, and divorced on August 31, 1978. She had seen the defendant first at a barbecue in approximately 1974. The defendant had come with Bob Handy. She saw the defendant just before Thanksgiving in 1978 at Engleman's dental office in the morning at a time that was not normal business hours. The witness recalled a conversation with Engleman on a Sunday afternoon in January of 1979 pertaining to Engleman's having met with the defendant and Bob Handy for the purpose of discussing a plan to kill the defendant's husband:

"He told me that the plan, one of the plans that they had discussed that day was to have Barbara, while her children were with her ex-husband, to have Barbara tied up in bed, and they were going to make it appear as though she were raped and beat up and that when her husband came home, he was going to find her like this, and he was going to kill—they were going to kill Ron, her husband."

The witness testified further:

"[Engleman] told [defendant] that in order to make it look realistic and authentic that she would be tied up for several hours, maybe even a day, and that she would defecate and urinate on herself, and to make it look as though she was not involved in this crime."

Engleman said that "Barbara didn't like the plan for the reason that she would—didn't want to get dirty or be involved in personally having this part of the thing happen to her, but that it would be alright if I did this." The defendant had, she said, suggested that the witness take her place. The witness testified that she and Engleman had had "many guns." She herself had had under her mattress a "small .38 caliber revolver," black with a pearl handle, which she had been unable to find after March of 1979. She testified that in September of 1979 Engleman had made a long distance call from her telephone to a number in Wood River, Illinois, that was shown by other testimony to be the number of the Amoco Oil Company.

Nick Miranda testified that he was acquainted with the defendant and had known her in 1959 or 1960, prior to her marriage to Dr. Boyle, when she resided in an apartment at the home of Dr. Engleman's mother. At the time Dr. Engleman was living with his

mother. The witness had seen the defendant 10 or 12 years later, after Engleman had given him her telephone number.

The Director of the State Crime Laboratory testified that the projectile removed from the body of Ronald Gusewelle was a .38 caliber projectile.

The State put on evidence concerning sections of wallboard taken from the north and west walls of the defendant's garage on August 7, 1984. The section of wallboard taken from the west wall of the garage had a single layer of paint on it, whereas the section of wall taken from the north wall had two layers of paint on it. The layer under the top coat of paint from this section was similar in color and chemical composition to the single layer of paint on the section of wallboard taken from the west wall. The garage doors appear to be on the west side of the garage. The section from the north wall was taken from about four inches above the level of the floor and three feet east of the garage door. Subsequent owners of the property, following the defendant's sale of it, testified that they had not painted the interior of the garage.

A forensic serologist with the State of Illinois, Dennis Aubuchon, testified for the State that on August 4, 1984, using a very sensitive reagent, he had examined the north and west walls of the garage, the floor adjacent thereto, and a few areas of the ceiling for the presence of blood. He said that he got a positive reaction for the presence of blood about 3½ feet from the west corner on the north wall and on the floor in that area, as well as about three feet from the floor on the west wall between the garage door and the northwest corner. The areas of reddish brown discoloration that he noticed were small; on the west wall he described them as "flecks." He was unable to say whether the blood was human. He observed that the color of the north wall was "yellowish," whereas the color of the west wall was white.

The State called as a witness Donna Gusewelle, Richard's wife, who testified that on April 2, 1979, prior to the discovery of Ronald Gusewelle's body, a cat suffered "a cut on its ear and a few scratches" as a result of having ridden under the hood near the engine of her car as she drove to the defendant's residence. The witness testified that there was blood on the defendant's driveway about 10 to 12 feet in front of the left garage door and that the defendant had become "very insistent" that the blood be cleaned up and had said that "if the police saw it, it would cause a commotion for nothing."

The State called as witnesses the police officers who were with

Handy as he retraced the route taken by him and Engleman to the Gusewelle residences in 1977 and 1979 and to Coleman's Plaza. They described his recognition of landmarks along the way, including "cattle rollers," or cattle crossing gates, in the driveway of the elder Gusewelles' residence. The route along which he directed them was in conformity with that about which he testified and was in accord with other evidence adduced. Handy directed the officers to the west side of Coleman's Plaza when showing them where the car containing Ronald Gusewelle's body had been parked.

As we indicated above, the State showed that the defendant had applied for several insurance policies on the life of Ronald Gusewelle with herself as beneficiary. Marvin Rennert, a document examiner from Gaithersburg, Maryland, for the Bureau of Alcohol, Tobacco, and Firearms in the Scientific Services Division, concluded, after examining handwriting samples of both the defendant and her husband, that the handwriting of the name of "Ronald Gusewelle" on an enrollment form for an accidental death and dismemberment policy with the Montgomery Ward Life Insurance Company was not that of Ronald Gusewelle and that the handprinting on the back designating the defendant as the beneficiary was that of the defendant. The witness concluded further that there was no basis for identifying Ronald Gusewelle as the author of the signature of that name in an enrollment form for additional benefits with the same insurance company. The witness testified similarly concerning the handwriting and handprinting on applications for insurance with the J. C. Penney Life Insurance Company.

The State called the defendant's 18-year-old son, David Boyle, to testify concerning an episode that had occurred in the winter of 1983 and 1984 when he was living with his family, including his mother, in Glen Carbon after having moved from Hamel. He said he could not remember having told Officer Dennis Kuba about a visit to the home by a woman unknown to him but identified by his mother in conversation with his sister as being named Engleman and wanting "money for Glennon Engleman to go to court and get out of jail." He testified that he did not remember having stated to Officer Kuba that his mother had expressed concern about how the woman had located their residence.

The State called as a witness the defendant's 22-year-old daughter, Barbara Jane Boyle, known as Jaymee, who testified that on the weekend of March 31, 1979, she and her two brothers were visiting their father, Dr. James Boyle. She testified to recalling no visit from a woman her mother had identified to her as Melody Gonter-

mann or as Engleman's sister. The witness later admitted upon further questioning that she had testified before the grand jury on September 6, 1984, that a woman whom her mother had identified as Engleman's sister had come to their house. The witness said that the woman had refused to identify herself, saying she knew the girl's mother and wanting to know where she was. Told that the defendant was in the back bedroom, to which the witness had gestured, the woman went there. The defendant told the witness later that the woman was Engleman's sister and that she had wanted money. The witness admitted that she had testified to the grand jury that her mother had told her that the woman had wanted money for Engleman's "court fees" and that "if she [defendant] didn't give it to him *** her [defendant's] life was in danger."

Dennis Kuba, an agent with the Illinois Department of Law Enforcement, testified that on July 19, 1984, David Boyle had indicated to him that seven or eight months earlier while at his mother's residence in Glen Carbon he had observed his mother terminating a conversation with an unknown visitor at the door. Shortly thereafter, David Boyle said, he had overheard his mother talking with his sister Jaymee. His mother had referred to the visitor as "an Engleman woman" and said that the woman had wanted some money from her "for Glennon Engleman to go to court and get out of jail." His mother had expressed concern about how the woman had found her residence in Glen Carbon and advised David to be careful when leaving the house. The family subsequently moved from the house in Glen Carbon to an apartment in Wood River.

Admitted into evidence for the State was a certified and exemplified copy of the release filed on December 17, 1979, by the Federal government of a Federal tax lien previously assessed against the property of Glennon Engleman in the amount of $13,715.10.

For the limited purpose of showing Handy's mental state at the time of making his plea agreement, the parties stipulated that if former State's Attorney Weber were to have testified, he would have stated that on June 28, 1984, he traveled to the Federal Correctional Facility at Springfield, Missouri, where Handy was incarcerated. At that time Handy observed that he was or had been scheduled for parole in 1985 but that parole had been extended to 1988. Weber had advised Handy of the evidence against him with respect to the Gusewelle murders, stating that Ruth Engleman and Nick Miranda would testify against him. Weber advised Handy that there was a "fair chance" that Handy would get the death penalty if convicted or, at the very least, a sentence of 60 years, and that

some consideration would be given to him if Handy provided "specific information with respect to the Gusewelle killings." Weber would have testified that Handy said he, Handy, wanted immunity but that Weber told him that in view of Handy's direct involvement and the evidence against him, immunity would not be given. Weber suggested to Handy that Handy ought to contact his lawyer before making any decision with respect to his cooperation. Although, according to Weber, no immunity would be given to Handy and no promises made, some consideration might be given because Handy appeared to be the least culpable of the three, namely, Handy, Engleman, and the defendant. Handy expressed the wish to consult with his attorney. According to the stipulation, Weber would have testified that on July 24, 1984, he interviewed Handy, who advised him that he had discussed a plea agreement with his attorney. Thereafter Handy discussed the plea agreement that we have already described with his attorney and entered into it. Weber would have testified that he had never suggested or detailed to Handy the information that Handy later related to police officers.

The defendant, who did not testify in her own behalf, called as a witness Andre Jones, who testified that at the time of trial he was in the custody of the State of Illinois and that on March 31, 1979, he was living at Coleman's Plaza with Lori Elam, since deceased. He testified that he had not killed Ronald Gusewelle but that on about September 17, 1979, in the St. Clair County jail he had made and signed a statement written out by Detective Robert Miller that he, Jones, had killed Ronald Gusewelle. In the statement, which is included in the record on appeal, the witness had said that "[a]bout 04-04-79" he and a female friend, whom he did not identify, had planned that she would walk the streets pretending to be a prostitute, looking for "some guy" to pick up, whom she would bring to Coleman's Plaza to be robbed. She returned to Coleman's Plaza with "this white guy," whom he described as "a big guy about 6 ft. and weight about 200 pounds." Jones said that when he attempted to rob the victim, he began to fight, adding, "We all fought for several minutes." Jones said he struck him "up side the head with my pistol but it didnot [sic] slow him down. The guy hit me and knock [sic] me across the room. He didnot [sic] stop. He just kept coming at me. I then shot the guy in the chest with my 38 special." He said that they took his money and put his body in the back seat of his car, "a light colored car, it was a Firebird or Camero." The gun, he said, he sold "to some guy on the street." Jones testified that on January 31, 1980, he had given Special Agent Dennis Kuba and Lt.

Robert Hertz a detailed statement concerning his killing of Ronald Gusewelle. At trial he said of his statement to Detective Miller in September of 1979:

> "Well, I received several documents from Detective Miller on the murder of Ronald Gusewelle, and I discussed in various of details of how he was killed, why he was killed, et cetera, et cetera about the Ronald—about the murder of Ronald Gusewelle."

He reiterated that Miller "made mention of the crime before he showed me the police reports and autopsy reports," from which Jones learned, he said, the "details of the crime." He testified that in the spring of 1984, former State's Attorney Weber had asked him to retract his confession and he had done so on video tape, at which time, he said, he had "received several police reports from Detective Miller." Jones testified that he did, in fact, have some personal knowledge of the crime but refused to divulge it, stating that Ronald Gusewelle was shot in East St. Louis.

On cross-examination he stated that he had also read newspaper accounts of the murder. He said that his attorney, Robert Gagen, did not to his knowledge have any materials pertaining to the Gusewelle case. He testified that he had talked to Gagen about the Gusewelle case after having made the confession to Detective Miller. He said he had told Detective Miller that the car in which he had put the body was parked on the side of Coleman's Plaza "facing St. Mary's Hospital," that is, the east side. In May or June of 1984, prior to recanting his confession he had, he said, indicated to police officers that the car was parked on the east side of Coleman's Plaza. He had also said at that time, in May of 1984, that he had used a "blunt object," namely, "part of a lamp fixture," to kill Ronald Gusewelle and had not stated that the victim was shot. He testified that at the time of trial he was on death row under three charges of murder and that he had committed those crimes. When he recanted his confession he did not state, he said, that he knew who had committed the crime; on cross-examination he stated that he knew who it was, that he would not say who it was, and that it was not the defendant. He stated that the first time, after recanting his confession, he had told law enforcement personnel or others associated with the case that he knew who had killed Ronald Gusewelle was the prior evening when he had "made mention of it" to investigators for the defense. Later, on recross, he said he had had "[n]o particular reason" for giving the statement of September 1979.

On redirect he stated that he had refused to identify Ronald Gu-

sewelle's killer because of fear for the safety of his family. The only source of information that enabled him to provide details in his statements about the death of Ronald Gusewelle was, he said, Detective Miller; his attorney, Robert Gagen, was not, he said, a source of such information.

Robert Miller testified for the defendant that he had interviewed Andre Jones on September 17, 1979, and had taken a statement from him. The witness said that he had not seen and had not himself had access to police files, autopsy reports, or other materials pertaining to the killing of Ronald Gusewelle. On cross-examination he stated that on September 6, 1979, he had discussed with Jones the murder of Ronald Gusewelle and that he had talked with Jones as many as 10 times between May 6, 1979, and October 15, 1979. He said he had not given Jones details about the incident that he might have read in the newspaper. He testified that Kuba and Spaul had talked with him on September 5, 1984, and had asked him "if it was possible that I read something in the newspaper articles, and my comment was that anything is possible, but I really don't believe I did."

Robert Gagen, Jones' court-appointed attorney in 1979 and 1980, testified for the defendant that he had not known Jones had confessed to the Gusewelle murder until he received the confession, "along with other discovery from the State's Attorney's Office." He stated that he was sure he had not at any time given Jones details about the Gusewelle killing.

The defendant called as a witness Major Robert Hertz, who testified that he had interviewed Jones on January 31, 1980, with Dennis Kuba in order to obtain additional details from him concerning his confessed involvement in Ronald Gusewelle's death. Jones' statement on January 31, 1980, was, he said, "[v]ery detailed":

> "He stated he shot him with a .38 caliber handgun, that it did happen at Coleman's Plaza. He gave a physical description of Mr. Gusewelle that was very close to the known physical description of Mr. Gusewelle, clothing, even down to the brand of cigarettes that Mr. Gusewelle was carrying in his shirt pocket at the time of his death, the time of the night when it happened, being late in the evening, which would have been consistent with Mr. Gusewelle getting off work that night at Standard Oil, the fact that he also hit him up side of the head with a piece of pipe, which would account for the open wound injury to the side of Mr. Gusewelle's head."

Jones stated that he had hit the victim on the left side of the head

and that he had shot him in the chest while the victim was lying on the floor. The witness testified further,

> "Again, the clothing description that he gave was very consistent of [sic] the known clothing description when Mr. Gusewelle was found, even down to the—to the shoes that he was wearing. He mentioned that there—he believed there was a package of Certs breath mints in the subject's pocket. When Mr. Gusewelle was found, the Certs breath mints were not found on his person, but were found—there was an open roll found inside the car."

The witness added:

> "He states that after he killed the individual, he put the individual's body in the victim's automobile and left the body in the vehicle. He stated that the vehicle of the victim was left facing St. Mary's Hospital in the area of the telephone company, which would have been inconsistent with the known facts. He stated that he believed that two or three days passed until such time as the body was found by the police, which was consistent with the investigation. He stated that, more specifically, that the body of the man was put in the back seat area of the car, which was consistent. He stated that they put some towels over the body of Mr. Gusewelle after he was in the car, which was consistent. He stated that he put a sack over the man's head which, my interpretation of a sack is different than a plastic bag, but he still admitted—."

Jones said that the vehicle was a two-door automobile, that he believed his girlfriend had taken the victim's wallet, and that he had taken the victim's wristwatch.

The witness testified that he had been involved in the investigation when Jones recanted his earlier statements, saying that Jones "was asked to talk to us more about the statement." He wasn't asked by Mr. Weber to recant that statement. The witness said that because "[t]he information from the federal authorities was inconsistent with the statement by Andre Jones" he had wanted to talk further to Jones. According to the witness, Jones stated in recanting his confession that some of the information had been given to him by Detective Miller and that additional information about the Gusewelle murder had been furnished to him by his attorney at the time, Robert Gagen.

On cross-examination the witness testified that Jones had indicated that the victim's vehicle was parked on the side of the motel opposite from the side where it was actually found. He said that on

May 22, 1984, he interviewed Jones with Dennis Kuba and former State's Attorney Weber in the presence of Jones' attorney at that time. On that date Jones still maintained that he was responsible for Ronald Gusewelle's death but stated that his girlfriend, whom he identified as Lori Elam, had met the victim in the lounge of Coleman's Plaza and had had the victim accompany her to Room 179 of the motel, which was the room in which Jones was living and is, in fact, on the opposite side of the building from the area where the victim's vehicle was found. Jones said he had struck the victim on the head with a table lamp and killed him. In this statement Jones made no reference to having shot the victim, whose automobile he described as a Ford Maverick. The witness testified, "He [Jones] was asked specifically if he shot the individual and his response was to the best of his memory, he did not, again stating that he only injured or killed this individual by hitting him with a lamp. *** His detail in this statement on May the 22nd of '84 was in less, substantially less detail than the statement was in January of 1980." Apparently during that interview, Jones said "in the presence of Mr. Weber, in the presence of his attorney, Mr. Hoffman, and Agent Kuba, that he was given a file of police reports and autopsy reports by his attorney, Bob Gagen, after the Motion for Discovery in the case." In Jones' statement on May 24, 1984, recanting his confession he also stated, according to the witness, that he did not know who had committed the crime. The witness testified further that the Bureau of Alcohol, Tobacco and Firearms had given him reports pertaining to the deaths of the three Gusewelles and had asked him in June of 1980 not to interview or to interfere in any way by questioning any persons whose names it had given him.

Edward Joehl testified for the defendant that he had sold to the defendant and Ronald Gusewelle a car that was delivered on March 10, 1979, which he described as a two-tone blue, four-door 1979 Chevrolet Caprice. The colors were light and medium blue.

Certain inmates who had been incarcerated with Robert Handy testified for the defendant that Handy had indicated to them that he would make false statements about the defendant's part in the Gusewelle killings in order to avoid prosecution by the State.

In rebuttal the State called William McGarvey, special agent with the Bureau of Alcohol, Tobacco and Firearms. The court instructed the jury that the testimony of McGarvey concerning prior statements of Handy was to be received by the jury for the limited purpose of rebutting the inference that Handy's testimony was a recent fabrication. McGarvey testified that on September 1, 1981, he

had interviewed Handy, who had stated at that time that in order to cooperate he would have to have assurances from the Federal judge who had sentenced him that he would get a reduction in the 18-year sentence for the mail fraud of which he had been convicted. Handy wanted, among other things, "some type of a deal or some type of arrangements made with Madison County pertaining to the state charges of murder." Advised by the witness that assurances concerning a reduction in sentence would not be possible and that he might eventually be indicted for the murders, whereupon his bargaining position would deteriorate accordingly, Handy responded "that he was aware of that and that he wasn't worried about the other people involved going to the police." Handy added that "[t]he only other people who knew about the murders were Barbara Boyle Gusewelle and Glennon Engleman, and he wasn't worried about either one of those two going to the police." According to the witness, Handy chose not to cooperate or to make a "deal" at that time.

In rebuttal the State also played the videotaped recording of Jones recanting his confession and called as a witness Dennis Kuba, who testified that on September 5, 1984, he went to the law office of Robert Gagen and his brother William, the latter of whom obtained and viewed in front of him a file pertaining to Andre Jones. The witness observed in the file "a St. Clair County Coroner's Inquest Report with an attached St. Clair County Autopsy Report signed by Dr. Steven Nuernberger." The autopsy report had attached to it diagrams concerning the autopsy performed on the body of Ronald Gusewelle and "a couple pages" that referred to the examination made upon autopsy. The witness testified that according to the St. Clair County Jail Visitor's Record for Andre Jones, which is in evidence, Robert Gagen visited Jones on September 5, 1979, one day prior to Jones' oral statement to Robert Miller.

The defendant called Robert Gagen as a witness in surrebuttal. He testified that on September 5, 1979, he had had no information about the Gusewelle murder. On October 23, 1979, he spent, according to his records, 2½ hours at the county jail with Jones concerning newly discovered materials produced with a letter of October 9, 1979, from the State's Attorney of St. Clair County, which specifies that enclosed are "copies of a series of police reports surrounding the investigation into the [death] of *** Ronald Gusewelle," among others. The reports were supplied in anticipation of the evidentiary hearing in aggravation and mitigation to determine whether the death penalty should be given to Jones. Prior to the receipt of that

letter the witness had received no material concerning the death of Ronald Gusewelle.

With regard to the defendant's sixth assignment of error, she maintains that her due process rights were violated because Handy's testimony was secured by an impermissible "contingent" agreement that amounted to an invitation to commit perjury. As a consequence, she urges, the trial court erred in denying her motion to exclude Handy's testimony. She acknowledges, on the basis of *United States v. Librach* (8th Cir. 1976), 536 F.2d 1228, that "it is undisputed that an agreement between the prosecution and witness for truthful testimony in return for favors is not *per se* illegal." She appears to rely principally upon *State v. Glosson* (Fla. 1985), 462 So. 2d 1082, and *Williamson v. United States* (5th Cir. 1962), 311 F.2d 441. In *Glosson* a paid informant was to receive 10% of all civil forfeitures arising out of criminal investigations initiated and participated in by him and was required to testify and cooperate in criminal prosecutions resulting from his investigations in order to collect the contingent fee. The criminal convictions in *Glosson* could not have been obtained without his testimony. Holding that criminal charges may properly be dismissed for constitutional due process violations in cases where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful operation, the court stated:

> "The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even permit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions." (462 So. 2d 1082, 1085.)

In *Williamson*, which involved the law of entrapment, the court refused to sanction a contingent fee agreement under which an informant was to produce evidence against particular named defendants as to crimes not committed when the agreement was made. We consider *Glosson* and *Williamson* inapposite to the case at bar. We have already set forth both the conditions under which the plea agreement was executed and its relevant terms and need not restate them. The agreement was plainly not contingent upon the defendant's conviction in order for Handy to benefit by it. Handy was required merely to "co-operate completely and fully" and to "testify truthfully" in any proceedings related to the investigation into the

deaths of the Gusewelles, conditions we do not regard as invitations to perjury. Thus, the trial court did not err in denying defendant's motion to exclude Handy's testimony on this basis.

■■■ ■ In the seventh issue she raises, defendant asserts that the trial court erred in admitting Ruth Engleman's testimony concerning her conversation with Glennon Engleman, in which he discussed plans made with the defendant to murder Ronald Gusewelle. Defendant maintains that the conversation did not meet the requirements for admissibility under the coconspirator's declaration exception to the hearsay rule and that the admission of the statement violated her rights under the confrontation clause. Specifically, she contends that the prosecution failed to establish the existence of a conspiracy between Glennon Engleman and the defendant by means of evidence independent of Ruth Engleman's testimony. It is well established that the acts and declarations of one coconspirator in furtherance of the conspiracy are admissible against another who is a defendant as an exception to the hearsay rule, even when the acts and declarations are made out of the presence of the defendant. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968; *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801.) To be admissible it is not necessary that a conspiracy be actually charged; it is, however, necessary to show at least a *prima facie* case that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968.) Defendant argues that "the only evidence of the Defendant's involvement in a conspiracy was the incredible and mostly uncorroborated testimony of Robert Handy." Without reiterating the evidence and unduly extending the length of this opinion, we think, as did the trial court, that the State made the necessary independent, *prima facie* evidentiary showing of a conspiracy or joint venture (*People. v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215) by means of that part of Handy's testimony in which he recounted, without reference to the statements of Engleman or the defendant, the events relevant to the killing of the Gusewelles. The credibility of Handy's testimony was, of course, a matter for the jury to assess.

■■ The defendant maintains further that the statement of Glennon Engleman to Ruth Engleman was not in furtherance of the alleged conspiracy between him and the defendant and was, therefore, improperly admitted under the coconspirator's declaration exception to the hearsay rule. This exception requires that admissible statements must be in furtherance of the common design and not

merely a narrative of what has already been done. (*People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968.) After having heard evidence concerning the admissibility of Ruth Engleman's testimony, the trial court observed:

> "The Court, having heard this testimony, concludes as we all earlier suspected, that Glennon Engleman was a braggart and liked to intimidate people. The Court still feels as it did earlier that most of the statements Glennon Engleman made to Mrs. Engleman were, insofar as the law is concerned, a narrative and were not in furtherance of the conspiracy; however, this witness, Ruth Engleman, testified that with respect to the statements made to her on that Sunday afternoon after Glennon Engleman returned from his meeting with Barbara Boyle and Handy and related to her this plan that Barbara had suggested wherein Ruth be tied up, that she, Ruth, considered that kind of talk to her to be a threat to her if she revealed her knowledge of these plans. That is what she said, that she considered it to be a threat to her if she revealed the plan, and the Court in conformity with earlier decisions of this Court wherein statements of that nature in an effort to persuade a person to keep quiet or to placate them are in furtherance of the conspiracy, finds that that statement, the conversation on the Sunday afternoon, is admissible. The others are not, and that is the Court's ruling."

Ruth Engleman had testified out of the presence of the jury that she was "always threatened" by Engleman and always fearful of him. She stated that "[h]e was always keeping me quiet" and that he had "told me that she [defendant] suggested that I should do it because he was—he had plans for me, too." The witness testified that she had considered this conversation with him as a threat to her personal safety should she reveal, and thereby thwart, the scheme. Warnings not to thwart a scheme constitute statements made in furtherance of the conspiracy. (*People v. Rogers* (1984), 122 Ill. App. 3d 384, 461 N.E.2d 511.) Thus, the trial court did not err in admitting into evidence, as being in furtherance of the common design, Ruth Engleman's testimony concerning Glennon Engleman's conversation with her about the plans made with Handy and the defendant to kill Ronald Gusewelle.

██ With respect to the defendant's assertion that the admission of Engleman's statement violated her constitutional right to confront witnesses against her, it is well settled that evidence admis-

sible under the coconspirator's declaration exception to the hearsay rule does not violate the confrontation clause of the sixth amendment where the defendant is able, as she was in the instant case, to confront and cross-examine the witness who alleges that the statement at issue was made. *People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215; *People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140.

■■ ■ Concerning the eighth issue defendant presents for our review, she maintains that the trial court erred in allowing Agent McGarvey of the Bureau of Alcohol, Tobacco and Firearms to testify on rebuttal about statements made by Handy that had not been provided to the defense prior to trial despite its request for discovery. As we have already stated, Agent McGarvey testified concerning Handy's prior consistent statement in order to rebut the inference of Handy's recent fabrication. The trial court, in ruling that McGarvey's testimony was admissible, observed that the State had made defense counsel aware of McGarvey's information as soon as it had become known to the State's Attorney, in accord with its continuing duty of discovery. The court noted the defendant's failure to disclose to the State, pursuant to Supreme Court Rule 413(d)(i) (107 Ill. 2d R. 413(d)(i)), that the witnesses who testified concerning Handy's recent fabrication would be called and observed that the substance of their statements should have been disclosed to the State by the defendant long before trial. The court concluded, we think correctly, that there had been no discovery violation on the part of the State. As the court stated in *People v. Shiflet* (1984), 125 Ill. App. 3d 161, 465 N.E.2d 942, Supreme Court Rule 412(a) (107 Ill. 2d R. 412(a)) requires the State to disclose to defendant the names and addresses of persons whom it intends to call as witnesses. The State's intent to call the witness is the critical element, and until the State forms that intent, there need be no disclosure. (*People v. Shiflet* (1984), 125 Ill. App. 3d 161, 465 N.E.2d 942.) Here, the State could not have formed the intent to call McGarvey to rebut the inference of Handy's recent fabrication until it became aware of the effort on the part of the defense to show that Handy's testimony was recently fabricated. Furthermore, the State had disclosed the name of this witness to the defendant but had not known of, and consequently had not disclosed, the information concerning his interview of Handy in 1981 about which he testified on rebuttal. Any prejudice or surprise to the defendant was blunted by her interview of the witness prior to his testimony and by the opportunity for cross-examination. Under the circumstances it was not an abuse of discre-

tion on the part of the trial court to refuse to exclude the rebuttal testimony of Agent McGarvey.

■■■ Concerning the defendant's ninth assignment of error, she maintains that she was deprived of a fair trial because Agent McGarvey testified that in September of 1981 he visited Handy and told him that his purpose in doing so "was that he was the subject of an investigation, that we were conducting an investigation into an insurance fraud scheme involving the deaths of three members of the Gusewelle family, and that he had been implicated in those killings, he along with Glennon Engleman, and Barbara Boyle Gussewelle." The trial court denied the defendant's motion for mistrial and over the defendant's objection admonished the jury "to disregard any opinion and conclusions that were stated by McGarvey to Handy and [to] consider McGarvey's statements to Handy only to show notice by McGarvey to Handy of what the government's intentions were and not insofar as McGarvey's statements are concerned as proof of the guilt of this Defendant." Following a further admonishment by the court in the same vein, the witness testified further that he had told Handy in September of 1981 that "the investigation implicated him, Robert Handy, Glennon Engleman and Barbara Boyle Gusewelle." The defendant urges that the trial court erred in admitting the testimony and in failing to grant her motion for mistrial based on its admission and in denying her motion for new trial on the issue. However, in view of the court's limiting instruction, we think that any error was at most harmless.

■■■ With respect to the tenth issue the defendant raises, whether a statement by Lori Elam to Robert Gagen was properly excluded as hearsay, the defendant maintains that it fell under the exception to the hearsay rule for statements against penal interest and that the exclusion of the statement violated her right to a fair trial. In an offer of proof the defendant called Robert Gagen as a witness, who testified that he had talked to Lori Elam, Andre Jones' girlfriend, as follows:

> "When I received this confession or statement and other discovery, and I can't tell you when it was because I really don't remember, but I did run into Lori either at the jail or at the courthouse, and I'm not sure which, and I asked her if she was there. And I might—let me explain that. In this statement, he mentions a girlfriend, but there's no name mentioned. Well, I knew who the girlfriend was, and I simply asked her—I told her about the statement and asked her if she was there, and she said she was, and that's all I asked her."

Defendant argues that the statement is "clearly against Ms. Elam's penal interest" and "would have corroborated the recanted confession of Andre Jones thus bolstering the defense's theory and exculpating the Defendant."

In *People v. Tate* (1981), 87 Ill. 2d 134, 143-44, 429 N.E.2d 470, 475, the supreme court addressed the penal-interest exception to the rule against hearsay:

> "The general rule is that a third party's extrajudicial declarations, not made under oath, that he committed a crime are purely hearsay and are inadmissible, even though they are declarations against interest. (*People v. Craven* (1973), 54 Ill. 2d 419, 427, citing *People v. Lettrich* (1952), 413 Ill. 172, 178.) However, the United States Supreme Court has relied upon the following four objective indicia of trustworthiness in holding that declarations against penal interest may be admissible: (1) The statement was spontaneous and occurred shortly after the crime; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and a declaration against interest; and (4) there was an adequate opportunity for cross-examination of the declarant. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49.) This court has adopted the language of *Chambers* and held that the presence of objective indicia of trustworthiness is necessary for admissibility under the admission-against-penal-interest exception. *People v. Craven* (1973), 54 Ill. 2d 419, 428-29."

Although the defendant contends that the statement of Lori Elam satisfies all of the objective indicia of trustworthiness announced in *Tate*, with the exception of her unavailability for cross-examination because of death, we must disagree. There is no indication that the statement was spontaneous and occurred shortly after the crime was committed. Nor is the statement that she "was there," without more, self-incriminating and a declaration against interest. Thus, the trial court properly excluded the statement of Lori Elam from evidence.

With regard to the defendant's eleventh assignment of error, she maintains that the trial court erred in refusing to instruct the jury to disregard Ruth Engleman's testimony if it did not believe Robert Handy's testimony concerning the existence of a conspiracy involving the defendant. Defendant argues that "the court used Handy's testimony as the foundation to admit Ruth Engleman's testimony which, in turn, bolstered the credibility of Handy's

testimony—a classic bootstrap effect. *** It is respectfully submitted that to permit such an inherently faulty testimony to serve as the foundation for admissibility of such highly prejudicial testimony which, in turn, served to bolster the faulty testimony violated the Defendant's fundamental right to a fair trial." In refusing to give the instruction, the trial court observed that an instruction singling out the testimony of a particular witness is not authorized under the law and that the jury would be instructed concerning its determination of the credibility of the witnesses. The jury was so instructed, and the trial court correctly refused to give the requested instruction.

In the twelfth issue raised for review, the defendant maintains that her right to due process was violated because the jury returned a verdict based on insufficient evidence. It would serve no useful purpose to reiterate the evidence adduced at trial. It is apparent that credibility of the witnesses played a large part in the jury's determination. It is the jury's responsibility to resolve contradictory evidence and factual disputes and to weigh the credibility of the witnesses. (*People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) Assuming that the jury found Robert Handy, in particular, to be a credible witness—and by its verdict it plainly did—there was sufficient evidence by which the jury could have found defendant guilty of the murder of Ronald Gusewelle beyond a reasonable doubt.

In the defendant's thirteenth assignment of error, she maintains that the trial court erred in failing to grant a mistrial or in giving a curative instruction when the prosecutor "improperly remarked about the existence of a conspiracy and the Defendant's participation in it before a proper foundation had been laid." She appears to refer to the remark made by the prosecutor in response to an objection during examination of the witness Handy, "Your Honor, I think this is admissible. We have a different situation here, and we are talking about establishing a conspiracy first between the original conspirators." The defendant's objection to the remark was sustained, and the error, given the extensive evidence, was harmless. She complains further that her right to a fair trial was denied by the prosecutor's remark in closing argument that the jury had the responsibility to enforce the criminal law. As the State observes, the remark was proper as an exhortation to the jury fearlessly to administer the law. *People v. Taylor* (1985), 137 Ill. App. 3d 148, 484 N.E.2d 383.

The defendant's final assignment of error concerns the sen-

tence imposed of 50 years. She argues that the trial court abused its discretion in imposing such a sentence because of "the relatively minor role" she played in the "purported scheme," the absence of any prior criminal record, and the results of the polygraph examination. A sentence imposed by a trial court will not be altered on review in the absence of an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In determining the sentence the trial court expressly considered factors in mitigation and in aggravation, including the defendant's receipt of compensation and the need for deterrence, as well as the evidence adduced at trial, the defendant's rehabilitative potential, and the right of the public to be protected. The court noted the defendant's age of 42 at the time of sentencing. On the basis of *People v. Baynes*, the court did not, as it had not at any stage of the proceedings, consider the results of the polygraph examination administered to the defendant. The court found that the murder was one involving exceptionally brutal and heinous behavior indicative of wanton cruelty, particularly because "the Defendant lived, ate, and slept with Ronald Gusewelle for years knowing that eventually the day would come when he would meet his death with her complicity. She planned for it, she took out insurance, and she profited by his death." The court observed that the motivation for the murder was greed: "It was through cold-blooded calculation that the Defendant gave life to her feelings of greed by snuffing out the life of Ron Gusewelle through the mechanism of Glennon Engleman. I think that is even more serious than the typical love-triangle murder." Upon conscientious consideration the court concluded that the imposition of an extended-term sentence was appropriate and, in view of all the circumstances, did not abuse its discretion in imposing a sentence of 50 years.

Affirmed.

KARNS, P.J., and KASSERMAN, J., concur.