THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ALLEN MACK, JR., Defendant-Appellant.—THE PEOPLE OF THE STATE
OF ILLINOIS, Plaintiff-Appellee, *v.* BRUCE JEFFERSON,
Defendant-Appellant.—
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ARTHUR JONES, Defendant-Appellant.

Fourth District   Nos. 16703, 16730, 16731 cons.

Opinion filed June 22, 1982.

Robert M. Hodge, of Chicago, for appellant Allen Mack, Jr.

Dennis Cunningham and Peter Schmiedel, both of Chicago, for appellant Bruce Jefferson.

Shelley A. Bannister, of Bannister, Block & Spevack, of Chicago, for appellant Arthur Jones.

C. David Vogel, State's Attorney, of Pontiac (Robert J. Biderman and James K. Horstman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

Defendants, Allen Mack, Jr., Bruce Jefferson, and Arthur Jones, appeal convictions of violations of section 3—6—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1003—6—4(a)) entered by the circuit court of McLean County after a jury trial. Section 3—6—4(a) provided that a person committed to the Illinois Department of Corrections who while participating in holding any person as a hostage "while participating in any disturbance, demonstration or riot, causes, directs or *participates* in the destruction of any property" is guilty of a Class 2 felony. (Emphasis added.) On October 2, 1980, each defendant was sentenced to a term of 3 years' imprisonment. As Jefferson was serving a different sentence at the time of sentencing than he was serving at the time of the offense, his sentence was ordered to be concurrent with the sentence he was serving at sentencing. The others were serving the same sentence at sentencing as at the time of the offense so their sentences were ordered to be consecutive to that sentence. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(f).) We affirm.

Defendants assert: (1) Their guilt was not proved beyond a reasonable doubt; (2) the trial court erred in allowing a motion to dismiss a defense motion to dismiss the charges because of prosecutorial misconduct; (3) the trial court erred in not suppressing identification testimony which was tainted; (4) defendants were prejudiced by the prosecutor's direct and indirect references to the use of polygraph examinations given to State witnesses; (5) the judge originally assigned to try the case erred in disqualifying himself based on defendants' motions requesting substitution as a matter of right rather than on their motions made for cause; (6) defendants were denied a fair trial by the trial court's moving the venue to McLean County rather than a county more distant from the occurrence and one having a larger black population; and (7) the court erred in not giving certain instructions.

We consider first the sufficiency of the evidence to support the verdicts. The following background facts are undisputed. On July 22, 1978, defendants were inmates at the Illinois State Prison at Pontiac in Livingston County. On that day the inmates at that institution rioted and by 9:40 a.m. the riot had reached massive proportions. Hostages had been taken. Many inmates were then in the yard and could not return to their cell blocks because the cell blocks had been locked. A forklift had been taken from one of the buildings and was used by inmates to punch holes in windows and doors in buildings which were subsequently looted and

torched. As the forklift was driven about by certain inmates various other inmates mounted it and rode on it. The contention of the State is that the defendants were among those that did so and thereby participated in the destruction of property which was effectuated by use of the forklift. The proof of their participation came entirely from the testimony of other inmates.

Prosecution witness James Sims testified that he was at a fence between buildings called the captain's office and the industrial building when he saw the forklift break through a door of the latter building and go toward the cold storage building, at which time defendant Mack got on the forklift and rode as it broke through a fence and went on to the cold storage building. Sims stated he had known Mack for three or four months prior to the riot. State's witness Maurice Childs testified to having been in about the same area as Sims and to having seen Mack on the forklift as it broke through the fence. Childs stated he had known Mack for about three weeks before the event. In return for their testimony, Sims was released from the prison 90 days earlier than scheduled and Childs was transferred to a medium security prison pursuant to his request that he needed the transfer for his safety.

Both Sims and Childs were impeached in ways other than the concessions made to them for their testimony. They both were, of course, convicted felons. Sims had been in one of the buildings when some guards were assassinated by inmates and expressed fear that he might be charged for the homicide. No showing was made, however, that the State had any evidence to support a charge. Sims had been given a disciplinary ticket for giving false information and had, in the past, been a user of heroin. Sims, also, admittedly had very poor eyesight. Childs admitted lying at his initial interview with a law enforcement agent concerning the riot.

Danny Newell testified that he was standing near the captain's office when he saw the forklift move to the cold storage building. He said that defendant Jefferson was behind the forklift as it ran into the cold storage building. Napoleon Hughes testified to having been standing between the cold storage building and one called R and D when the forklift came through a gate and thereafter Jefferson got on the lift. Hughes stated that the lift then went to the cold storage building, but he did not say that Jefferson was on it as it ran into the door of that building. Perry Murphy testified that from the north corner of the industrial building, he saw Jefferson get on the lift and ride upon it as it went to the cold storage building and that there the lift was used to try to break open the door to that building. Murphy stated that Jefferson was on the lift when an attempt to break the door was made but did not state definitely that Jefferson was on the lift at the time it made impact with the door.

The latter three witnesses were impeached in much the same way as

were Sims and Childs. For his testimony, Hughes received 90 days' credit on his sentence and a letter of appreciation to the parole board. He was subsequently paroled after 6 years' incarceration on an indeterminate sentence of 10 to 30 years for attempt murder. Murphy received 30 days' good time credit. After his release from prison, the State found secret places for him to live in Illinois and Indiana, paid his rent and found a job for him. Newell was subsequently paroled.

Six witnesses identified defendant Jones as having ridden on the forklift. Danny Patton said he saw Jones riding on it and waving his arms as it went west from the cold storage building. James Hubbard testified to seeing Jones on the lift as it was removing a metal gate from a window of the captain's office. Hughes said Jones was on the lift when it broke the back door at the cold storage building. Murphy's testimony also placed him at that place at that time. Charles Media and Newell also testified to seeing Jones riding the lift at one time or another. Patton and Media both also received concessions from the State for their testimony.

Defendants maintain that the proof of their guilt was insufficient both because the witnesses whose testimony we have related were unbelievable and because, even if the testimony were believed, it did not show that the defendants had participated in the destruction of property within the meaning of the statute defining the offense of which they were convicted.

We agree with defendants that their mere presence at the scene of the destruction of the property would not have been sufficient to convict them. However, section 3—6—4(a) of the Unified Code of Corrections defines the activity giving rise to the offense as *causing, directing or participating* in the destruction of property. Because of the use of the disjunctive, the defendants need not have caused or directed the destruction to be guilty even though they were charged with causing *and* participating in the disturbance. (*People v. Calcione* (1938), 369 Ill. 154, 15 N.E.2d 859.) By use of the additional word "participates" the legislation evidences an intention that it be given wide coverage. The appropriate mental state for the offense would logically be knowledge. The circumstantial evidence presented, if believable, clearly showed that the defendants would have known the lift was stolen, was being used illegally and was being used to destroy property. A defendant riding on the vehicle, knowing it was an instrument of destruction on its way to perform destruction, would be participating in the destruction even if he was not on the vehicle at the time it actually made contact with objects to be destroyed.

■■ In arguing the State's inmate witnesses were not worthy of belief, defendants emphasize the undisputed evidence that (1) concessions were made by the State to the witnesses for their testimony; (2) all inmates

including the witnesses had endured a strict lockup during the period in which they were being interviewed and deciding whether to testify for the State; (3) agents of the State were vigorous in their attempt to get testimony; (4) during the interview period many witnesses changed their position in regard to the occurrence and made statements inconsistent with prior statements; and (5) some of the testimony of the State's witnesses at trial was inconsistent with prior statements made by those witnesses. Ordinarily the weight to be given to the testimony of witnesses who have given direct testimony of the commission of an offense by an accused is for the trier of fact even though the witness was thoroughly impeached. Nevertheless, in some instances the impeachment and inherent weakness of the testimony requires as a matter of law that the accuseds be acquitted. In arguing that this is such a case, defendants cite a number of cases but rely primarily upon *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883; *People v. Richardson* (1974), 21 Ill. App. 3d 859, 316 N.E.2d 37, and *People v. Smith* (1971), 3 Ill. App. 3d 64, 278 N.E.2d 551.

In *Kiel,* a conviction for conspiracy to commit murder was reversed where based solely on the testimony of an accomplice who was admittedly so much under the influence of narcotics at the time of the event that he did not then know what he was doing. The witness had made no mention to police of the defendant's participation in the offense for two years and had mentioned it only after he had been arrested for armed robbery and burglary for which he was not prosecuted. The witness had denied remembrance of the event at a preliminary hearing and made conflicting statements. In *Richardson,* the conviction of a defendant for reckless homicide was based entirely upon a police officer's testimony that defendant had admitted to him that he was driving 65 or 70 miles an hour going over a bridge. The officer had made no mention of this admission until trial and it was contrary to his notes of the occurrence. The defense put on substantial evidence of the defendant's having driven properly and that a mechanical failure caused the collision. In *Smith,* a murder conviction was reversed because it was based solely on the testimony of a witness whose testimony was impeached and directly contradicted at trial.

The proof here differs from that in the cited cases most strongly in that the guilt of none of the defendants was based solely upon the testimony of a single witness. Secondly, we do not find the testimony of the State's witnesses to be substantially out of conformity with each other except that of Charles Media. As his testimony aided only the prosecution against defendant Jones and that defendant's participation was testified to by several other witnesses, that inconsistency was not a fatal flaw. We also do not find the testimony of individual witnesses to be grossly internally

inconsistent. We recognize that their testimony was often inconsistent with previous statements they had made or actions taken. Such a situation is inherent when inmates, after protecting other inmates or wishing not to be involved, turn State's evidence. We are also aware of the extremely strong incentive the State's witnesses had to manufacture testimony in order to obtain rewards from the State, but we consider that to merely be a matter for the trier of fact to have weighed with the other evidence.

Considering the corroboration of the evidence of guilt of each defendant and that the State's evidence was not contradicted by any direct evidence, we hold that a reasonable jury could have found each defendant's guilt to have been proved beyond a reasonable doubt. The bias of the witnesses and the extent to which their testimony was internally contradictory or contradicted by their prior statements or the testimony of other witnesses were merely matters for the jury to consider in weighing the evidence.

■■ Defendants' claim that the trial court should have allowed their pretrial motion to quash the charges for prosecutorial misconduct is based upon evidence of the methods used by law enforcement and correctional officers in the setting of a lockup which existed for some six months after the riots. Although no case was presented where charges have been dismissed on such grounds, defendants analogize to *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244, where the court upheld the dismissal of charges where defendants were prejudiced by unreasonable delay by the prosecution in bringing charges. They also analogize to milestone cases where the United States Supreme Court held that evidence wrongfully obtained must be excluded to protect the integrity of the judicial process. *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *Nardone v. United States* (1939), 308 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266.

An offer of proof was made by the defendants in support of their motion to quash the charge. The offer indicated that during the lockup: (1) Inmates were generally not allowed out of their cells except to be interviewed by those investigating the riot; (2) for the first three months inmates were not allowed showers; (3) meals were delivered to the cells and passed to the inmates through the bars resulting in considerable spillage; (4) much dispute developed over the manner in which the food was delivered and whether the spillage was intentional; and (5) much dispute developed as to the medical attention afforded inmates. By stipulation, a transcript of Dr. Marvin Schwartz, given in a Federal case, was presented. He testified that after touring the prison during the lockup and talking to inmates, he formed an opinion that the existing conditions would likely cause the inmates to fabricate testimony in order to escape the lockup. Evidence was then offered: (1) In the face of the foregoing situation at

least one investigator lied to inmates from whom he sought information by telling them they were to be indicted when such was not the case; (2) numerous promises of concessions in exchange for testimony were made by investigators to inmates; and (3) the conduct of investigators was coaxing and coercive.

● 3, 4 A trial court has inherent power to dismiss a charge when due process so requires (*Lawson*), but this should rarely be done. (See *People ex rel. Sears v. Romiti* (1971), 50 Ill. 2d 51, 277 N.E.2d 705.) We need not decide whether the trial court should have heard the motion rather than dismissing it because the offer of proof shows the evidence to have been insufficient to support the charge. To support a dismissal of a charge, prosecutorial misconduct must result in actual and substantial prejudice to a defendant. (*Lawson; People v. Haag* (1979), 80 Ill. App. 3d 135, 399 N.E.2d 284; *People v. Rivera* (1979), 72 Ill. App. 3d 1027, 390 N.E.2d 1259.) We cannot tell what the testimony before the grand jury was but the offer of proof gives no indication that there was any taint to the evidence so pervasive as to vitiate the charge. Traditionally, an indictment has not been quashed because of lack of proper grand jury evidence unless all evidence before that body has been deemed subject to suppression. (*People v. Jones* (1960), 19 Ill. 2d 37, 166 N.E.2d 1.) The relationship between the prosecution and the inmate witnesses who testified at trial has been previously set forth. We find nothing in the transactions between those witnesses and the State that constitutes prosecutorial misconduct.

No reversible error resulted from the trial court's ruling on defendants' motion to dismiss the charges.

■■ We likewise do not find the trial court to have erred in refusing to suppress the identification testimony of any of the inmate witnesses who testified at trial. We do not deem the incentive they had to identify some person as having been a participant to be suggestive as to who they should name. Many of them were presented with volumes containing photographs of all prisoners in particular cell houses at the prison, but this was probably the only reasonable way to proceed with the investigation. No showing was made that any of the pictures were presented in such a way as to suggest that one of the defendants was a participant in the offense, nor was there evidence that any investigator otherwise suggested that any of the witnesses should pick out any picture.

Prior to trial, the trial court allowed a defense motion to exclude from evidence all reference to polygraph tests which the State had apparently required its inmate witnesses to take in order to lessen the likelihood that it would be using perjured testimony. Nevertheless, during the State's presentation of its case in chief, its witness, Lindsey, an investigator, testified that he discussed with inmates concessions the State might grant for testimony in order to get them involved in the case but he would not

accept at face value the statements the inmates made. He was then asked what scrutiny he would place upon their statements. He responded:

"Well, if they named names I would—those people would be interviewed to corroborate what was said by the witness. I would compare statements made by other witnesses with the witness that I had received the information from to corroborate or to substantiate his consistency. I would ask if he would submit to a polygraph examination—."

The court then sustained an objection and instructed the jury to disregard the answer, saying it had "nothing to do with this case."

Later, in the cross-examination of the inmate witness Sims, he was asked about his fears that he might be prosecuted. He stated he was not spending a great deal of time thinking about it because he had not done anything. He was then asked if he had "that much confidence in the ability of the system to distinguish who had and who had not." He answered:

"Well, I figured if they were going to try to convict anybody or somebody, they would have given lie detector tests. That's what I was hoping for."

The defense made a motion for a mistrial but did not ask that the answer be stricken. Counsel argued that the witness had been coached to give the answer. The trial court denied the motion.

On another occasion, after Napoleon Hughes had been impeached by a prior inconsistent statement, the State produced a statement which Hughes had signed and which apparently contained his agreement with the State to give concessions in exchange for his testimony. The agreement was not made part of the record but was shown to state that Hughes agreed to take a polygraph test. After objection by the defense to permitting the witness to give the terms of the agreement as it was stated, Hughes was permitted to testify that the agreement stated he would "cooperate with [Illinois Department of Law Enforcement] procedures to verify the authenticity and truthfulness" of the statement he had given the State.

During the testimony of Charles Media the witness was permitted on direct examination to testify, over defense objection, that before he was given a second interview when he identified defendant Jones and Michael Mitchell as riding on the forklift, he submitted to a "procedure, to verify the truthfulness and veracity of [his] statement." At that time the trial court told the prosecutor that no further allusion to such procedures would be allowed.

Finally, in closing argument the prosecutor stated:

"You also heard from Officer Lindsey that he thought, in his opinion, a deadlock made possible false information. That is a

question that exists any time you talk with anyone about anything, whether they may be a normal citizen or another police officer. False information may come out of any interview. Deadlock is a situation out of which false information may come and he described to you certain procedures available to them both to and at July 22, 1978, whereby they could verify the authenticity of the statements given. He described those procedures. He said that before information would be accepted, that it would be subject to this procedure or series of procedures and that witnesses would be asked if they would be willing to submit to procedures of IDLE—."
A defense objection was sustained and the jury was instructed to disregard that portion of the argument. Prior to closing argument, the trial judge had again instructed the State to refrain from references to procedures used by the State to verify the statements of its witnesses.

Our supreme court has most recently discussed the admissibility of the results of polygraph tests in *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070. There the trial court had admitted evidence that the defendant had taken a polygraph test and that certain of his answers indicated he was not telling the truth about matters pertinent to the alleged offense. The supreme court held the admission of the evidence to require reversal even though before taking the test the defendant has stipulated the results might be admitted and had neither objected to the evidence at trial nor cited its admission as error in his post-trial motion. The court noted that the accuracy of the procedure has been estimated to be as low as 70% by a critic to as high as 86% by a proponent but that accuracy is very dependent upon the examiner's interpretation of the readings given by the polygraph machine. The court considered that not only was the reliability of the procedure a problem but also the tendency of juries to greatly exaggerate the importance of test results was likely to be highly prejudicial to a defendant in a criminal case.

Here, no evidence of the results of polygraph tests were presented and the reference to tests were to those that might have been taken by witnesses for the State. In *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310, the State called in rebuttal a witness who stated that the defendant who had testified had a poor reputation for truth and veracity. On cross-examination the witness was questioned about the State having investigated him in regard to the offense with which the defendant was on trial and about the witness' conversation with the State. On redirect, the witness was asked if he had taken any tests and he answered he had taken a polygraph test whereupon the answer was stricken by the court. This court held that no reversible error occurred.

■■ Here, the testimony by investigator Lindsey was that he would compare statements of the various witnesses and would ask them if they

would take a polygraph test. There was no showing that any particular witness had taken a polygraph test, and the jury was directed to disregard the reference to such tests. The reference to the comparing of statements was not objected to and is not now claimed as error. The only other time direct reference was made to a polygraph test was the testimony of Sims and came when he was being cross-examined by the defense and was responsive to the question asked. Thereafter the references were to procedures used to determine whether the witnesses were telling the truth. By the court's ruling on Lindsey's testimony the jury would have been led to believe that the procedures were to compare the statements of the witness with those of others. The prosecutor's argument emphasized the comparing of statements. Defendants have not raised an issue as to the propriety of testimony or argument to that effect. Accordingly, we find no reversible error to have occurred although the prosecutor violated the trial court's direction not to refer to the procedures it used to test the reliability of its witnesses.

■■ Before trial defendants made simultaneous motions for substitution of judges under section 114—5(a) and 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 114—5(a) and 114—5(c)). The motion under section 114—5(a) sought substitution as a matter of right with each defendant seeking the substitution of one judge. The motion under section 114—5(c) was substitution for cause against the Honorable William T. Caisley, who had been assigned to try the case and was one of the judges listed in the section 114—5(a) motion. Judge Caisley heard the section 114—5(a) motion first and granted it, thus making moot the other motion. In claiming that the procedure was erroneous defendants apparently are maintaining that the judge should have passed on the motion based on prejudice first so that if it was granted they could then amend the other motion in order to obtain a substitution from an additional judge as a matter of right. We are aware of no precedent for such a theory and do not agree that defendants had such a right. The procedure used by Judge Caisley was proper.

The prosecution was begun in Livingston County. Defendants made pretrial motion for change of venue which was granted and the trial moved to McLean County. Defendants then filed a motion for a further removal to Cook County claiming they were prejudiced because of McLean County, which is adjacent to Livingston County, was too close to Pontiac and had too small a black population to give defendants, all of whom were black, a fair trial. Defendants supported their motion by the offer of a survey purporting to show that 78.3% of people interviewed in McLean County thought the defendants were "definitely guilty or probably guilty." The court refused to admit evidence of the survey and defendants do not cite this ruling as error. The only other evidence offered

was the testimony of Sandra Consalvo, clerk of the Jury Commission of McLean County, who testified that she observed prospective jurors called for service in the county and that between January and June 1980 only about 10 of 400 people appearing for jury service during that time were black. She also testified to an opinion that about 5% of the population of the county was black.

■■ ■ Even if the survey results had been admitted into evidence, that alone would not have made the decision to deny a change from McLean County erroneous. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208.) Furthermore, the trial court liberally granted defense challenges of prospective jurors for cause. We are aware of no right that defendants had to a trial in a county having a large number of people of the same race as defendants. The trial court's refusal to remove the case from McLean County was not error.

■ ■ Lastly, defendants assert the court erred in not giving instructions with reference to the consideration to be given to the testimony of witnesses who are narcotics addicts or accomplices. The record does not show that instructions on either subject were ever tendered. In order to complain of the refusal of instructions, an appellant must present a record containing the instructions offered and given. (*People v. Daily* (1968), 41 Ill. 2d 116, 242 N.E.2d 170.) Moreover, the record here does not show that either instruction would have been proper. Any instruction with reference to addicts would have been directed to the State's witness Sims. However, the only evidence of this addiction was his own testimony, and he said he was free of the habit by the time of the occurrence. (See *People v. Smith* (1979), 70 Ill. App. 3d 250, 387 N.E.2d 901.) The accomplice instruction would have been aimed at all the State's inmate witnesses. The test of whether such an instruction should be given is whether the witness whose testimony is in issue could have been charged properly with the offense. (*People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772.) Clearly none of those witnesses could have been. The defendants maintain the instruction should have been given because the witnesses had much of the same motivation as accomplices. Although the motivation of such witnesses can and should be argued to the jury, no precedent exists to instruct specifically as to this type of bias. No error resulted from the trial court's rulings on instructions.

Finding no reversible error to have occurred we affirm.

Affirmed.

WEBBER and TRAPP, JJ., concur.