*In re* J.H., a Minor (The People of the State of Illinois, Plaintiff-Appellant, v. J.H., a Minor, Defendant-Appellee).

First District (1st Division)   No. 85—1043

Opinion filed December 7, 1987.

CAMPBELL, J., dissenting.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

The State appeals from an order of the circuit court of Cook County dismissing the grand jury indictment against defendant on the ground it was obtained as a result of prosecutorial misconduct. For the following reasons, we reverse.

The record reveals that on August 18, 1984, at approximately 3

a.m., defendant J.H., age 15, was at the Roosevelt Road subway station on 1200 South State Street in Chicago, Illinois. Defendant had just come from a party at an establishment called the "Candy Store" at 13th and Michigan. Several of defendant's friends, Louis Marshall, Gerard Cooper, Vincent Stepter, Brian Hoard, and three individuals known as Milfred, Ant, and Curry were also at the station when a southbound train arrived. Three people, one of whom was Frederick Harris, stepped off the train and were heading toward the stairway when Gerard Cooper approached Harris. The two shook hands, spoke a few words, and then Cooper yelled, "[W]e got us some." Cooper proceeded to strike Harris in the head, and after doing so, he, defendant, and several of the other youths began chasing Harris and his two companions. Harris' friends ran up the stairs in the station, but Harris continued running down the platform with Cooper and defendant in pursuit.

When Harris reached the end of the platform and attempted to climb onto the tracks, Cooper hit Harris in the head again and kicked him in the back. Consequently, Harris fell on the third rail of the tracks, where he was electrocuted and subsequently run over by an oncoming train. Shortly thereafter, the police arrived and a murder investigation ensued.

The following facts were disclosed at the hearing on defendant's motion to dismiss the indictment. On two separate occasions on August 19, the day after the incident, police officers went to the apartment of defendant's mother, Barbara Humphrey. Ms. Humphrey testified that on their first visit, the officers, whose names she did not know, told her they wanted to question defendant about some "video games" and she informed them that he did not reside with her. When different officers, whom Ms. Humphrey could only describe as white males in plain clothes, appeared later that evening, she repeated that defendant no longer lived with her, but lived with his sister and legal guardian, Torra Humphrey. Ms. Humphrey further testified that the officers assured her, "It was nothing *** to get alarmed about, they just wanted to ask him a few questions." Then, the officers performed a consensual search of her apartment.

During this second visit, the police officers encountered Gad Israel, defendant's father, who testified that the officers told him they wanted defendant "for something that happened downtown." They also told Israel that "[t]hey wanted him [defendant] to be a witness about something," but did not mention what that "something" was. Israel also could only describe these officers as white males in plain clothes.

The following morning, defendant, his mother, and his father went to police headquarters at 51st Street and Wentworth Avenue. According to Israel, after telling one of the officers that he had to go to work, he was told that he could "go ahead on," because they would be at the station all day. The officer also told Israel that the police wanted to question defendant as a "witness" regarding "an incident at the el." Israel left the station at around noon and went to work.

Ms. Humphrey stated that she remained at the station, and at about 1:30 p.m., she, along with defendant, had a conversation with a policeman, a youth officer, and an assistant State's Attorney whose names she could not remember. They told her that they only wanted to talk to defendant as a witness to a murder at the subway, and that afterward, he could go home. Ms. Humphrey stated that defendant was not under arrest at that time, and that she told the three men "it would be okay" for her son to testify before the grand jury.

Before leaving the station at 7 p.m., Ms. Humphrey spoke to someone several times about taking defendant home. Initially, she was told that he could not go because he had to wait for the arrival of an assistant State's Attorney. Later, she was told he could not leave because he had to be in court the next day to give the statement he had given the authorities, but he would be home "tomorrow." Ms. Humphrey did not call an attorney since she "didn't need a lawyer, it wasn't nothing he [defendant] had done."

Clifford Clark, defendant's counselor from the Unified Delinquency Intervention Services for the Juvenile Court, testified that he went to the police station in the early afternoon on August 20, at the request of defendant's mother. A police officer told Clark that defendant was there "only for some questioning." At 3 p.m., Clark spoke to defendant in the presence of a female youth officer and two detectives, and then he spoke to defendant alone. After their conversation, Clark waited an hour until he spoke to a "sheriff" about defendant's release, but according to Clark, the sheriff "kept putting *** [him] off." Prior to Clark's leaving the station at 4 or 4:30 p.m., the same officer told him that defendant would be released "as soon as they finished processing." Clark could not recall the name of the officer to whom he had spoken.

The following afternoon, August 21, Clark went to the criminal courts building at 26th and California. When he arrived, he saw the defendant alone in a hallway outside the grand jury room, not handcuffed, and acting "as if he'd been playing basketball." Clark stated that while at the courthouse, he was approached by two people. The first individual, whom Clark had never seen before, inquired as to

Clark's relationship with defendant. The second unidentified person told Clark that defendant was at the courthouse for questioning and stated that "somebody" would take defendant home.

Torra Humphrey, defendant's sister and legal guardian, testified that she too went to the criminal courts building on August 21 at 9:30 a.m. Upon her arrival, she observed defendant with another young boy in the snack shop accompanied by a person whom she believed to be a police officer. She could not recall if the man was black or white. The man told her that defendant had to make a statement and afterward would be ready to go home. The four then left the snack shop and went upstairs to the grand jury room.

Torra further testified that at 2 p.m., she, defendant, and Clark had a discussion with an assistant State's Attorney during which the attorney told defendant "to tell him his story" and he would help him. The attorney also told him that after defendant told his story, he could leave. Torra left the courthouse at approximately 2:30 p.m. to go to work.

James Epstein, assistant public defender and counsel for Gerard Cooper, testified on behalf of the State that he interviewed defendant at 11 a.m. on August 21 for about 10 to 15 minutes. Clark and Assistant Public Defender Tim Ackerman were also present. Epstein introduced himself to defendant and Clark, showed them his identification card, and told them he was Gerard Cooper's attorney. Defendant told Epstein that he did not have a lawyer, that he was merely a witness, and that he would be going home after testifying before the grand jury. Defendant proceeded to describe the events of August 18 at the subway station. He never mentioned that he participated in the chase and stated that he tried to help the victim off of the tracks.

Assistant State's Attorney John Romano testified that he received a call on August 21, 1984, concerning the Harris murder, and reported to the courthouse at 26th and California. When he arrived, he discussed the case for 30 to 45 minutes with two detectives and read the police reports. He learned that Gerard Cooper was in custody and the only individual charged in the case. Romano proceeded to interview five witnesses, including defendant.

Prior to interviewing defendant, the detectives informed Romano that defendant had been on the "el" platform at the time of the murder. Defendant had told police and another assistant State's Attorney the previous day that he was present when the incident occurred, but for the most part, he observed it from a bench. Defendant did not mention that he chased the victim.

Romano testified that he spoke to defendant at approximately 1

p.m. with two detectives present. After asking some preliminary questions, Romano gave defendant *Miranda* warnings as to his rights, which defendant waived. According to Romano, defendant told basically the same story as he had told the police and the other assistant State's Attorney. Romano then told defendant that the other witnesses had related a different story than what defendant had described, and admonished him to tell the truth before testifying in front of the grand jury. As a result, defendant gave a different version of what happened on August 18, which was substantially the same as his testimony before the grand jury.

Defendant testified before the grand jury at 2 p.m. that same afternoon. Prior to being sworn in, Romano represented the purpose of the proceeding to the grand jury as a "John Doe" for information only investigation into the murder of Frederick Harris. He asked the jury "to pay close attention to the testimony they heard because we might be seeking an indictment some later time."

The transcript from the grand jury proceedings reveals that Romano first questioned defendant about his age and his being advised of his constitutional rights in their prior interview. Thereafter, Romano gave defendant his *Miranda* warnings, which defendant waived after stating that he understood them as well as the fact that he could be tried as an adult. Defendant also admitted that he was given his constitutional rights before he spoke to the police and assistant State's Attorney on August 20, 1984, and that no threats or promises were made to him.

Defendant proceeded to describe the events of the night in question to the grand jury, stating that when Cooper yelled "[W]e got it—us some," he understood it to mean that "[t]hey had somebody to beat up." Defendant admitted that he and Cooper chased Harris, and that defendant did so with the intention of beating Harris up. Defendant asserted that he told a different story to the authorities on the previous day "[b]ecause *** [he] didn't want to get involved in it."

The next four eyewitnesses testifying before the grand jury described the murder in the same way as defendant. Each stated that they observed defendant and Cooper chasing Harris. Following their testimony, Romano informed the grand jury that he was seeking a true bill of indictment against Cooper and defendant for the murder of Frederick Harris. After deliberation, the grand jury indicted them both.

Defendant moved to dismiss the indictment, alleging that the "course of conduct leading up to defendant'a appearance before the Grand Jury was clearly calculated police and prosecutorial misconduct

and overreaching" resulting in a denial of due process. The trial judge granted defendant's motion to dismiss, reasoning that the assistant State's Attorney secretly intended to indict defendant once defendant told his inculpatory story and that the assistant State's Attorney's failure to inform defendant of this intention violated defendant's fourteenth amendment rights. It is from this ruling that the State appeals.

The State argues that the trial court's finding of prosecutorial misconduct in dismissing the indictment was erroneous because the State had no duty to inform defendant of his change in status from witness to target of an indictment where defendant made an inculpatory statement only 15 minutes prior to his appearance before the grand jury. Defendant asserts that the particular facts and circumstances of this case, in addition to the State's failure to warn defendant of his target status, warranted dismissal of the indictment on fourteenth amendment grounds. We believe defendant's contention is without merit.

■■ A trial court has the inherent authority to dismiss an indictment in a criminal case where there has been an unequivocally clear denial of a defendant's right to due process. (*People v. Bragg* (1984), 126 Ill. App. 3d 826, 467 N.E.2d 1004.) The supreme court has emphasized, however, that courts must proceed with restraint and ascertain preindictment denial of due process only with certainty. (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) Furthermore, to support dismissal of a charge, prosecutorial misconduct before a grand jury must result in actual and substantial prejudice (*People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396), and the burden of proving such misconduct is on the defendant. *People v. Stanley* (1981), 95 Ill. App. 3d 910, 420 N.E.2d 727.

■ Defendant maintains he met this burden of proving prosecutorial misconduct and urges this court to consider in its determination that defendant was a 15-year-old eighth grader during these proceedings, was detained by police for more than 24 hours without probable cause, was never served with a subpoena, and along with members of his family, was repeatedly told that he could go home only after testifying before the grand jury. Defendant claims as a result of these "coercive" conditions, he could not freely and intelligently waive his right to counsel and privilege against self-incrimination. While such allegations of fourth, fifth, and sixth amendment violations may be an appropriate basis upon which to grant a motion to suppress evidence, we do not believe that they constitute sufficient justification for dismissal of the grand jury indictment in the present case.

■ We further reject defendant's contention that the assistant State's Attorney had a duty to warn defendant that he was a target of an indictment before testifying before the grand jury. In support of this proposition, defendant relies on two Federal district court cases, *United States ex rel. Caserino v. Denno* (S.D.N.Y. 1966), 259 F. Supp. 784, and *Schenk v. Ellsworth* (D. Mont. 1968), 293 F. Supp. 26. We find these cases unpersuasive in light of the more recent United States Supreme Court decision *United States v. Washington* (1977), 431 U.S. 181, 52 L. Ed. 2d 238, 97 S. Ct. 1814, cited by the State. In *Washington*, the defendant, who was suspected of theft, was subpoenaed to appear as a witness before the grand jury investigating the crime. The prosecutor did not advise him before his appearance that he might be indicted, but he was given a series of warnings after being sworn, including that he had the right to remain silent. The defendant testified nevertheless and subsequently was indicted.

The trial court in *Washington* granted defendant's motion to suppress his grand jury testimony and quash the indictment on the ground it was obtained in violation of the defendant's fifth amendment privilege against self-incrimination. The appellate court affirmed the suppression order, finding it most significant that the prosecutor failed to advise the defendant of his target status, but declined to dismiss the indictment, holding that an indictment returned by a properly constituted grand jury may not be challenged on the ground that it was based on unconstitutionally obtained evidence.

■ While the Supreme Court in *Washington* did not address the validity of the indictment, it reversed the lower courts' decision to grant the defendant's motion to suppress. The Court reasoned that the comprehensive warnings the defendant received before testifying dissipated any element of compulsion to self-incrimination that might otherwise be present and that the surrounding circumstances put defendant on notice of his target status. The Court also noted the fact that a subpoenaed grand jury witness is a potential defendant "neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, [and] potential-defendant warnings add nothing of value to [the] protection of Fifth Amendment rights." 431 U.S. at 189, 52 L. Ed. 2d at 246, 97 S. Ct. at 1820.

The defendant in *Washington* also argued that because of its fundamental unfairness, the failure to warn him of his target status violated the fifth amendment due process clause. The Supreme Court dismissed this argument, articulating that it "simply restates respondent's claims under the Self-Incriminating Clause and is rejected for the same reasons. Moreover, there is no evidence of any governmen-

tal misconduct which undermined the fairness of the proceedings." 431 U.S. at 190 n.6, 52 L. Ed. 2d at 247 n.6, 97 S. Ct. at 1820 n.6.

As the defendant in *Washington*, defendant here was told that he was merely a witness to the crime. He was also given his *Miranda* warnings before he spoke to the prosecutor immediately prior to his appearance before the grand jury, as well as in front of the grand jury itself. Furthermore, defendant must have been aware of his potential criminal liability when the assistant State's Attorney informed him that the other witnesses related a different story regarding the events of August 21, admonished him to testify honestly before the grand jury, and apprised him of his *Miranda* rights at the grand jury proceedings. Thus, we conclude that defendant was no more entitled to a target warning than the defendant in *Washington*.

The trial court in the instant case considered *Washington* in making its ruling to dismiss the indictment against defendant. Its opinion purports to distinguish the holding in *Washington* on several grounds:

> "The principles discussed therein do not apply to the instant motion which alleges violation of due process of law under the Fourteenth Amendment. Here the issue is prosecutorial misconduct. No such issue was raised in *Washington*, supra, n.6, at 1820. Washington's story was exculpatory and he was indicted when the Grand Jury chose not to believe it. Further, no indictment was being sought of Washington before he appeared. Here, defendant's story was self-implicating, and he was not a mere target [*sic*] but the ASA was seeking his indictment before calling him before the Grand Jury."

We find the trial court's attempts to distinguish *Washington* unavailing. First, as discussed above, the case at bar not only involves the allegation of a fourteenth amendment due process right violation, but also claims of fourth, fifth, and sixth amendment infringements. Moreover, a due process violation under the fifth amendment was asserted by the defendant in *Washington* and rejected, and defendant here has not shown how the two due process clauses differ with respect to the rights they protect. Next, the fact that the defendant's story in *Washington* was exculpatory while defendant's story here was inculpatory has no bearing on the nature of the privilege against self-incrimination. (See *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) Finally, in both cases, the prosecutors were at least aware of the possibility that the defendants could be indicted even though they had been told that they were merely witnesses. See *United States v. Washington* (1977), 431 U.S. 181, 183, 52 L. Ed. 2d 238, 242, 97 S. Ct. 1814, 1816.

Defendant's efforts to distinguish *Washington* from the instant case are not more persuasive than those of the trial court. Defendant initially contends that in *Washington*, the defendant was subpoenaed to appear before the grand jury, whereas defendant here was not. Under section 112—4(b) of the Criminal Code of 1961, however, "[t]he Grand Jury has the right to subpoena and question any person" (Ill. Rev. Stat. 1985, ch. 38, par. 112—4(b)), but a subpoena is not mandatory. Furthermore, "[a]ny person appearing before the grand jury," whether subpoenaed or not, is entitled "to be accompanied by counsel" (Ill. Rev. Stat. 1985, ch. 38, par. 112—4.1), and defendant in the present case was advised of this right.

Defendant also maintains that *Washington* is inapplicable because in that case there was no prosecutorial misconduct. Based on the record here, we similarly cannot conclude that the conduct of the authorities amounted to an "unequivocally clear denial of defendant's right to due process." Members of defendant's family and defendant's youth counselor testified at the hearing on the motion to dismiss the indictment that they were repeatedly told that defendant was merely a witness who could not go home until he testified, yet, not one of them was able to name or identify the pertinent parties. Additionally, as the trial court found and defendant's mother admitted, defendant was not under arrest. In fact, defendant voluntarily went to the police station on August 20, and the following day was seen roaming the hallways of the criminal courthouse alone and eating in the snack shop. Defendant's mother testified that she gave permission for her son to testify before the grand jury, and the transcript of the grand jury testimony discloses that the police, an assistant State's Attorney, and prosecutor Romano gave defendant *Miranda* warnings prior to interviewing him and that defendant was again given *Miranda* warnings in front of the grand jury.

Defendant asserts, however, that the standard *Miranda* warnings given defendant during the grand jury proceedings were insufficient in light of section 112—4(b) of the Criminal Code of 1961, which provides that a person against whom the State's Attorney is seeking an indictment shall be informed that "he has the right to refuse to answer any question that will tend to incriminate him." (Ill. Rev. Stat. 1985, ch. 38, par. 112—4(b).) Defendant reasons that while ordinarily *Miranda* warnings would provide greater protection, in this case, the section 112—4(b) warning would have alerted defendant that he could testify, as he allegedly believed he had to, without answering questions about his participation in the chase. Any "legally untrained fifteen year old eighth grader" who could discern the fine distinction be-

tween those rights clearly could understand and knowingly waive his *Miranda* rights, thus defeating a major premise of defendant's argument on this appeal.

We further find that the trial court's and defendant's reliance on *United States v. Doss* (6th Cir. 1977), 563 F.2d 265, is misplaced. In *Doss*, the defendant was questioned before a grand jury about a crime for which he stood already secretly indicted. The court held that the grand jury proceeding was an abuse of process which violated the defendant's fifth and sixth amendment rights and, therefore, he could not be subsequently prosecuted for perjury committed in such an invalid proceeding. The court distinguished *United States v. Washington* discussed above, along with two other United States Supreme Court decisions, by stating that, "In no one of these three cases *** had the witness been indicted—much less secretly indicted." (563 F.2d at 274.) It is precisely this fact which makes *Doss* inapplicable to the present case.

■ While the trial court recognized that defendant here "had not yet been indicted," it asserted that "the ASA secretly intended to seek an indictment before he called defendant to testify." The court bases this conclusion on the fact that defendant was given *Miranda* warnings by Assistant State's Attorney Romano at the interview prior to testifying in front of the grand jury while the other four witnesses were not, that defendant was not informed after that interview that he was no longer a witness, and that Romano represented to the grand jury that they were proceeding by the way of information only in a John Doe investigation of the homicide of Frederick Harris. We do not believe that these factors are indicative of a secret intent to indict where: (1) defendant had been previously given his *Miranda* warnings by the authorities without being charged in the crime; (2) defendant changed his story minutes before testifying in front of the grand jury; (3) defendant was not legally entitled to a target warning; (4) the prosecutor was seeking to indict the already charged Gerard Cooper but did not mention his name when explaining the nature of the proceeding to the grand jury; and (5) the prosecutor could not be certain as to what defendant and the other witnesses would attest to before the grand jury.

■ We next address the State's contention that the trial court improperly determined that the grand jury testimony of the four eyewitnesses was, by itself, insufficient to support defendant's indictment. As support for this ruling, the trial court stated after reviewing their testimony, the witnesses "merely testified to defendant's presence in the group chasing Harris." We note that while the trial court

has inherent supervisory authority to review grand jury transcripts and determine whether any evidence was presented which tends to connect the accused to the offense charged (*People v. Rodgers* (1982), 92 Ill. 2d 283, 442 N.E.2d 240), it is precluded from inquiring into the adequacy and competency of that evidence. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629; *People v. Jones* (1960), 19 Ill. 2d 37, 166 N.E.2d 1.) Since the trial court did not find that the testimony of the other witnesses failed "to connect the accused to the offense charged," but rather it placed defendant at the scene of the crime chasing the victim, the court lacked the authority to assess the sufficiency of the evidence presented.

The trial court maintained that even if the testimony of the four witnesses alone sufficiently inculpated defendant, defendant's self-incriminating testimony warranted dismissal of the indictment under *Boone v. The People* (1894), 148 Ill. 440, 36 N.E. 99. In *Boone*, unlike in the present case, the defendant was removed from jail, taken before the grand jury unaware of his rights, and was the only witness examined. Thus, *Boone* is not controlling here.

The State also argues that the trial court erred in finding that "[d]efendant indicted himself with the assistance of the ASA's skillful leading questions." In a related argument, the State contends that defendant did not make the required showing of "actual and substantial prejudice" to quash the indictment. Again, we agree.

■■ ■ In order for a grand jury to properly indict a defendant, it must determine that there is probable cause for believing that that defendant has committed an offense. (Ill. Rev. Stat. 1985, ch. 38, par. 112—4(d); see also *People v. Rodgers* (1982), 92 Ill. 2d 283, 442 N.E.2d 240.) Under this standard, it is not necessary that evidence be presented for each element of the offense but only that there be some evidence relative to the charge. (*People v. Rodgers* (1982), 92 Ill. 2d 283, 442 N.E.2d 240.) Given that the testimony of the four eyewitnesses put defendant at the scene of the crime chasing the victim along with Gerard Cooper, who was charged with the victim's murder, we find that there was a sufficient basis upon which to indict him.

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing the indictment issued against defendant is reversed and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

O'CONNOR, J., concurs.

JUSTICE CAMPBELL, dissenting:

I must respectfully dissent from the result reached in the majority opinion because I find that there is an adequate basis in the record to support the trial court's finding of prosecutorial misconduct. In my opinion, the trial court was justified in dismissing the indictment for the reason that, while there may have been some competent evidence to support the indictment, the minor's testimony was rendered incompetent by the prosecutorial misconduct in obtaining the testimony.

In reaching its decision, the trial court made detailed findings of fact covering the events from the time the 15-year-old eighth grader entered the police station to the time the prosecutor brought him before the grand jury 28 hours later. Following initial inquiries by police investigators, the minor's parents took him to the police station at 9 a.m. on August 20, 1984. After the father left the station to go to work, and sometime before 1:30 p.m., the mother asked to take the minor home. She was told that the minor had to wait for the State's Attorney and could not leave. At 4 p.m., the minor's youth counselor, Clifford Clark, asked when the minor would be released and was told the minor would be released when they finished processing. At 7 p.m., the minor's mother again asked to take him home and was told by a detective that the minor had to stay because he had to go to court the next day. The officer assured the mother that the minor was merely a witness to a killing being investigated and would be home the next day after he had made a statement. The police then detained the minor overnight at the police station with neither parent present and against the parents' wishes. The following morning, 24 hours after the minor had entered the police station, the police took him from the station to the criminal court building at 26th and California.

At one point in the early afternoon, the youth counselor saw the minor alone outside the fourth floor grand jury room. However, when the minor later went to the snack shop on the first floor, he was accompanied by a police officer. This officer later told the minor's sister and guardian, Torra Humphrey, that the minor had to make a statement before he could leave. The minor was then interviewed by the public defender who represented Gerald Cooper, who was already in custody for the crime. The trial court related the subsequent events as follows:

> "[J]ust before testifying, the Assistant State's Attorney [ASA] interviewed defendant. Two detectives were present. The ASA testified he gave only the defendant the *Miranda* rights. He did not give those rights to the other four witnesses he interviewed prior to their testimony before the Grand Jury. Thereaf-

ter, defendant told the ASA the same story he had told all along. The ASA told defendant the others were telling a different story. Defendant then made a different statement. The ASA testified that this statement implicated defendant in the killing and thus defendant was no longer merely a witness."

As a result, the grand jury returned an indictment for the minor.

In making its determination to grant the minor's motion to dismiss the indictment, the trial court stated that the issue in the instant case was prosecutorial misconduct and distinguished *United States v. Washington* (1977), 431 U.S. 181, 52 L. Ed. 2d 238, 97 S. Ct. 1814, where the Supreme Court held that defendant was not entitled to a target warning, from the present case on the ground that there was no evidence of any governmental misconduct in *Washington*. On this appeal, the majority found that the trial court's attempts to distinguish *Washington* were "unavailing" and that the minor must have been aware of his potential criminal liability when the assistant State's Attorney informed him that the other witnesses related a different story. Therefore, the majority concluded that the conduct of the authorities did not amount to an "unequivocally clear denial of defendant's right to due process," and the minor was no more entitled to a target warning than the defendant in *Washington*.

The instant record discloses that members of the minor's family and his youth counselor testified at the hearing on the motion to dismiss the indictment that they had been repeatedly told that the minor was merely a witness, but could not go home until he testified. Although not one of them was able to name or otherwise identify the responsible parties, I do not find that their inability to do so undermined their testimony. It is not reasonable to expect the mother, the sister and the youth counselor to identify any of the police personnel or others when there was no reason for them to know their names and when they fully expected the minor to be released shortly. They had been assured repeatedly that the minor's appearance was routine and, thus, they saw no need to take precautions to identify or to remember the names of the parties involved or to obtain an attorney. In my view, the family and youth counselor had been lulled into inaction by the conduct and promises of the police personnel and the prosecutor in a coercive atmosphere.

In addition, the minor argues in his brief that a defendant must be informed specifically that he has the right to refuse to answer any question that will tend to incriminate him. (Ill. Rev. Stat. 1985, ch. 38, par. 112—4(b).) Pursuant to the record, the minor was not told that he had the right to refuse to answer any questions that would

tend to incriminate him. Instead, he was read a standard form *Miranda* warning informing him that he had the right to remain silent. This reading of *Miranda* had little or no effect once he had been in custody for 24 hours and had been told that he could not leave until he testified. The minor further argues that as a 15-year-old eighth grader, if he had exercised his right to remain silent, he would not have been allowed to leave. His detention, already in its second day, would have continued. The warnings specifically required by section 112—4(b) would have informed him that during his testimony, he could have refused to answer questions about his participation in the chase. In my opinion, the prosecution's failure to follow the law which requires that a defendant be informed of his right to refuse to answer questions was prejudicial and lends support to the trial court's conclusion that prosecutorial misconduct resulted in a denial of the minor's right to due process of law.

The prejudice to the minor was demonstrated in the grand jury proceedings, where the following colloquy ensued between one of the grand jurors and the minor:

"A JUROR: Why didn't you want a lawyer? Why did you refuse a lawyer? Why did you refuse the help of a lawyer?

THE WITNESS: Why?

A JUROR: Why didn't you want a legal—when he asked you if you wanted a lawyer, why did you say no?

THE WITNESS: Because I didn't know if I needed a lawyer or not.

* * *

A JUROR: Do [*sic*] your sister know you are here?

THE WITNESS: Yes, ma'am.

A JUROR: She is here with you?

THE WITNESS: No, ma'am. She had to go to work.

A JUROR: Did she talk to the State's attorney or anyone downtown when the police brought you down? Did she?

THE WITNESS: My mother and father brought me to the police station, sir.

A JUROR: Your mother and father brought you down here?

THE WITNESS: Yes.

A JUROR: Did they talk to the police?

THE WITNESS: They talked to the police."

The majority opinion disposes of the above colloquy by stating that "[A]ny 'legally untrained fifteen year old eighth grader' who could discern the fine distinction between those rights [under section 112—4(b)] clearly could understand the knowingly waive his *Miranda*

rights, thus defeating a major premise of defendant's argument on this appeal." (164 Ill. App. 3d at 727-28.) The majority concludes that the minor knowingly waived his *Miranda* rights. However, the majority does not cite to any basis in the record for this finding and I am unable to conclude that the record and the totality of the circumstances establish or support a finding of the minor's knowing waiver of his *Miranda* rights.

In my view, the facts and circumstances in the instant case present compelling reasons to affirm the ruling of the trial court. As previously noted, throughout the initial 28-hour detention, neither defendant nor any member of his family had been told that defendant was free to leave. In fact, they had been told the opposite. No friend, family member or attorney stood at defendant's side as the prosecutor questioned defendant and gave *Miranda* warnings. The trial court, as trier of fact, heard and saw the witness and was in a better position than the majority to conclude on the record that the assistant State's Attorney's actions in using the grand jury like an inquisition violated the minor's right to due process of law.

It is the province of the trier of fact to draw inferences from the evidence and to determine the credibility of witnesses and the weight to be given their testimony. (*People v. Zuniga* (1973), 53 Ill. 2d 550, 293 N.E.2d 595.) A reviewing court may not substitute its judgment for that of the trier of fact on questions regarding the weight of the evidence of the credibility of the witnesses. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) The prosecution knowingly presented the testimony of the 15-year-old to the grand jury after deliberately misrepresenting the facts and circumstances to the family members and the youth counselor. The decision to use said testimony should not be that of the prosecutor. The minor's due process rights were not safeguarded and the claim to dismiss the indictment should be allowed. *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.

Moreover, in my opinion, the conduct of the prosecutor was prejudicial and objectionable. (See *People v. Beringer* (1987), 156 Ill. App. 3d 309, 509 N.E.2d 578.) This court should deter this kind of conduct to guarantee that the prosecution acts with due regard to the rights of minors. (See *In re B.R.* (1985), 133 Ill. App. 3d 946, 479 N.E.2d 1084.) Under the totality of the surrounding facts and circumstances, the trial court was correct and should be affirmed.